STATE OF CONNECTICUT *v.* JOHN SANTIAGO
(14518)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and F. X. HENNESSY, Js.

*(Two justices dissenting)*
Argued September 24, 1992—decision released February 9, 1993

*Rita M. Shair,* assistant state's attorney, with whom were *C. Robert Satti, Sr.,* state's attorney, *Peter McShane,* deputy assistant state's attorney, and, on the brief, *Mark J. Migliaccio,* law student intern, for the appellant (state).

*William T. Koch, Jr.,* special public defender, for the appellee (defendant).

F. X. HENNESSY, J. The principal issue in this case is whether the defendant's warrantless arrest in the doorway to his home, which is accessed by crossing a porch, violated the fourth amendment to the United

States constitution.[1] The state charged the defendant, John Santiago, by substitute information with threatening in violation of General Statutes § 53a-62, possession of narcotics in violation of General Statutes § 21a-279 (a), and possession of drug paraphernalia in violation of General Statutes § 21a-267. The defendant moved to suppress the evidence seized at the time of his arrest arguing that his arrest was illegal under the fourth amendment. After a hearing, the trial court, *Koletsky, J.*, denied the defendant's motion. The defendant thereafter entered a plea of nolo contendere to the second and third counts conditioned on his right to appeal the trial court's ruling.[2] He subsequently was sentenced to a four year term of imprisonment. His sentence was suspended and he was placed on probation for four years with special conditions. The defendant appealed to the Appellate Court, which reversed the judgment of the trial court. *State* v. *Santiago,* 26 Conn. App. 481, 602 A.2d 40 (1992). We thereafter granted the state's petition for certification to appeal. We reverse the judgment of the Appellate Court.

The following facts are not disputed. On March 25, 1989, in response to a report that the defendant had threatened a neighbor with a handgun, a New London police officer went to the housing complex where the defendant resided. After interviewing a neighbor and another person, the officer located the defendant's

---

[1] The defendant claims a violation of the federal constitution only, abandoning any argument pertaining to the Connecticut constitution. Accordingly, our analysis will be confined to the requirements of the fourth amendment to the United States constitution.

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] The state nolled the misdemeanor charge of threatening.

apartment and knocked on the door. The defendant opened the door, stood directly in the doorway and spoke with the officer. The defendant denied threatening the neighbor and refused to allow the officer to search his apartment. The officer then asked the defendant to remain where he was while the officer went to consult with his supervisor. After weighing the witnesses' and the defendant's accounts of the incident, the police officer decided to arrest the defendant for threatening. When the officer returned to the defendant's apartment, the door was still wide open and the defendant was still standing in the doorway. The officer arrested the defendant for threatening. During a subsequent search of the defendant's person, the police recovered a pipe containing the residue of narcotics.[3]

The defendant moved to suppress the evidence seized at the time of his arrest claiming that it was removed from his person after he had been arrested in violation of his rights under the fourth amendment. The trial court, concluding that the arrest was proper because it was based on speedy information and probable cause, denied the defendant's motion.

The defendant appealed to the Appellate Court, which emphasized that the area in front of the defendant's apartment was a porch, and concluded that as such it "is intrinsically associated with both the sanctity of the home and the privacies of life." *State* v. *Santiago,* supra, 489. The Appellate Court held, therefore, that the porch was within the zone of fourth amendment protection and accordingly reversed the judgment of the trial court. Id., 490.

We granted certification limited to three issues: (1) "Was the Appellate Court correct in not ruling that a defendant standing in the doorway of his home is in

---

[3] The place of the search is not indicated in the record and it is not at issue in this appeal.

a public place, and may be arrested without a warrant?"
(2) "Was the Appellate Court correct in holding that
a porch is a part of the home, and is subject to fourth
amendment protections?" (3) "Was the Appellate Court
incorrect in reversing the trial court's factual finding
that the defendant was in his doorway and instead
engaged in fact finding to determine that the defend-
ant was on a porch which was an extension of his
home?" *State* v. *Santiago,* 221 Conn. 920, 608 A.2d 686
(1992). We disagree with the Appellate Court's reso-
lution of the first and second issues and reverse its
judgment.[4]

I

The state first contends that the Appellate Court
improperly ruled that, because the defendant was taken
into custody while standing in the doorway of his home,
he was illegally arrested. We agree.

General Statutes § 54-1f (a) authorizes police officers
to arrest an individual without a warrant, "for any
offense in their jurisdiction, when the person is taken
or apprehended in the act or on the speedy informa-
tion of others . . . ." Additionally, a warrantless mis-
demeanor arrest must be supported by probable cause.
*State* v. *Elliot,* 153 Conn. 147, 152–53, 215 A.2d 108
(1965); *State* v. *Kaplan,* 20 Conn. App. 183, 186, 565
A.2d 11 (1989).

Even where there is probable cause to arrest a sus-
pect on the speedy information of others, however, "the

---

[4] We need not pursue the third issue because our examination of the rec-
ord and the opinion of the Appellate Court makes it clear that the decision
of the Appellate Court did not depart from the findings of fact of the trial
court. The Appellate Court accepted the trial court's factual finding that
the defendant had been standing in his doorway at the time of his arrest;
*State* v. *Santiago,* 26 Conn. App. 481, 484, 602 A.2d 40 (1992); but con-
cluded, as a matter of law, that the threshold was a part of his home, for
constitutional purposes, in light of the undisputed fact that the area in front
of the defendant's apartment was a porch.

fourth amendment prohibits the police from making a warrantless . . . entry into a suspect's home in order to make a routine . . . misdemeanor arrest." *State* v. *Brosnan,* 221 Conn. 788, 795, 608 A.2d 49 (1992), citing *Payton* v. *New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), and *State* v. *Gallagher,* 191 Conn. 433, 437 n.4, 465 A.2d 323 (1983). In *Payton,* the United States Supreme Court stated that "[t]he Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home. . . . In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton* v. *New York,* supra, 589–90.

It is undisputed in this case that the police had probable cause, based on speedy information, to arrest the defendant. The relevant inquiry, therefore, is whether the threshold to the defendant's house is public for the purposes of the fourth amendment to the United States constitution or whether it is entitled to the privacy afforded the home by the fourth amendment. The United States Supreme Court has decided this issue.

In *United States* v. *Santana,* 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976), the United States Supreme Court considered the legality of a warrantless arrest of a defendant who was standing in her doorway when approached by the police. In *Santana,* the defendant was standing directly in the threshold: "[O]ne step forward would have put her outside, one step backward would have put her in the vestibule of her residence." Id., 40 n.1. As the police neared her house, she retreated into her home where the police arrested her. Id., 40. The defendant moved to suppress the evidence

seized at the time of her arrest, claiming that the warrantless arrest in her home had been illegal. The court held that because the defendant had been standing in the threshold of the doorway to her house, she had been in a public place and therefore had been legally arrested. Id., 42, citing *United States* v. *Watson,* 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976).

In determining that the open doorway was a public place, the court reasoned that " '[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.' " *United States* v. *Santana,* supra, 42, quoting *Katz* v. *United States,* 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). The court further noted that the defendant "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *United States* v. *Santana,* supra, citing *Hester* v. *United States,* 265 U.S. 57, 59, 44 S. Ct. 445, 68 L. Ed. 898 (1924).

The reasoning in *Santana* is applicable to the federal constitutional issue raised in this case. It is undisputed that the defendant was standing in the doorway at the time of his arrest. The record establishes that the defendant voluntarily came to the threshold in response to a knock on his door by a police officer. There is no claim that the officer forced his way into the defendant's residence, or indeed that the officer in any manner concealed his identity from the defendant or otherwise coerced him into coming to his door. There is equally no claim that the defendant, while on his threshold, was not in full public view; the defendant's doorway was only a few feet from the road, and visibility was not obstructed by the overhang from the first floor apartment, which covered the porch.[5] At the offi-

---

[5] The officer's testimony described the area in front of the defendant's apartment as both a "cement stoop" and a "porch area."

cer's request, the defendant consented, for an indefinite period of time, to remain on his threshold, in full public view, while the officer consulted with his supervisor. The officer then returned to arrest the defendant while he was still standing on the threshold. As a result of a subsequent search, incriminating evidence was thereafter seized not from the defendant's residence but from his person.

These undisputed facts place this case, as a matter of federal law, squarely within the precedent established by *Santana* unless *Santana* has been impliedly limited by the subsequent decision of the United States Supreme Court in *Payton* v. *New York,* supra. A majority of state and federal courts has concluded that no such limitation was intended, especially when, as in this case, there is no evidence of coercive or deceptive behavior on the part of the police. See, e.g., *United States* v. *Sewell,* 942 F.2d 1209, 1211–12 (7th Cir. 1991), cert. denied, U.S. , 112 S. Ct. 1567, 118 L. Ed. 2d 213 (1992); *United States* v. *Carrion,* 809 F.2d 1120, 1127–28 (5th Cir. 1987); *United States* v. *Edmondson,* 791 F.2d 1512, 1515 (11th Cir. 1986); *United States* v. *Al-Azzawy,* 784 F.2d 890, 892–93 (9th Cir. 1985); *United States* v. *Morgan,* 743 F.2d 1158, 1166 (6th Cir. 1984), cert. denied, 471 U.S. 1061, 105 S. Ct. 2126, 85 L. Ed. 2d (1985); *People* v. *Burns,* 200 Colo. 387, 615 P.2d 686 (1980); *Byrd* v. *State,* 481 So. 2d 468, 472 (Fla. 1985), cert. denied, 476 U.S. 1153, 106 S. Ct. 2261, 90 L. Ed. 2d 705 (1986); *People* v. *Morgan,* 113 Ill. App. 3d 543, 447 N.E.2d 1025 (1983); *Costillo* v. *Commissioner of Public Safety,* 416 N.W.2d 730, 732 (Minn. 1987).

Justice Borden's dissenting opinion nevertheless emphasizes the holdings in a minority of cases, such as *United States* v. *Berkowitz,* 927 F.2d 1376 (7th Cir. 1991), *United States* v. *McCraw,* 920 F.2d 224 (4th Cir. 1990), *Duncan* v. *Storie,* 869 F.2d 1100 (8th Cir.), cert.

denied, 493 U.S. 852, 110 S. Ct. 152, 107 L. Ed. 2d 110 (1989), and *State* v. *Schlothauer,* 206 Neb. 670, 294 N.W.2d 382 (1980), that conclude that a defendant does not surrender his reasonable expectation of privacy in his home merely by opening his door in response to a knock by the police. Under the analysis adopted by these cases, it is arguably a violation of the fourth amendment for the police to effectuate an arrest even when the defendant is in plain view on his own doorstep unless the defendant has manifested his acquiescence in the arrest.

We need not decide today whether we should follow this minority line of cases. We emphasize three facts that are conjointly dispositive to establish that the defendant had voluntarily relinquished any expectation of privacy at the time of his arrest: the police at no time set foot inside the defendant's home; the defendant's arrest did not immediately follow the defendant's appearance on his doorstep after a knock on his door; and the defendant willingly remained on his doorstep at the request of the police. Even in *Berkowitz,* the court held that the defendant would be deemed to have acquiesced in his arrest if he had not attempted to question his arrest, or to close the door, but had merely asked whether he might retrieve his coat from inside his home. *United States* v. *Berkowitz,* supra, 1385–86. The manifestations of acquiescence on the present record are clear. Far from attempting to close his door, the defendant unconditionally agreed to the request of the police officer that he remain standing in his doorway for at least several minutes. The defendant was, moreover, not unaware of his legal rights: he had previously refused to permit the police to enter his home without a search warrant. Under *United States* v. *Santana,* supra, 42, "[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." (Inter-

nal quotation marks omitted.) In the circumstances of this case, we conclude that *Santana* governs the validity of the defendant's arrest and that his arrest was, therefore, not a violation of the fourth amendment.

## II

The state next claims that the Appellate Court should not have concluded that the defendant's front porch was an extension of his home that sufficiently insulated the doorway from the public so as to make *Santana* inapplicable. We agree.

The Appellate Court accepted the trial court's conclusion that the area in front of the defendant's doorway was a porch, and held that the presence of the porch per se entitled the defendant to fourth amendment protection within its confines. *State* v. *Santiago,* supra, 26 Conn. App. 489–90. The court reasoned that "[a] porch is intrinsically associated with both the sanctity of the home and the privacies of life." Id., 489. Therefore, "the defendant's porch, in which he had exclusive possession, is as sacrosanct as the home itself for fourth amendment purposes." Id., 489–90. We disagree.

Under *Santana,* the relevant inquiry is whether the defendant, while in the doorway, exposed himself to the public. If he was exposed to the public despite the intervening porch, he was not in an area where he had a reasonable expectation of privacy. If the defendant did not have a reasonable expectation of privacy, he is not protected by the guarantees of the fourth amendment. See *Minnesota* v. *Olson,* 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); *Katz* v. *United States,* supra.

The defendant's porch did not obstruct the public's view of or access to the defendant while he stood in the doorway. Moreover, the record discloses no attempt

by the defendant to make the porch a private area. Because the defendant, by standing in the doorway, "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [his] house," he had no reasonable expectation of privacy. *United States* v. *Santana,* supra, 42. The simple fact that there is a porch or stoop in front of a house does not make the threshold a place entitled to fourth amendment protection. If, standing in the threshold of one's home, an individual is visible to and accessible to the public, he or she can be legally arrested without a warrant under the fourth amendment to the United States constitution.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion PETERS, C. J., and CALLAHAN, J., concurred.

BORDEN, J., dissenting. I disagree with the majority that this case is controlled by *United States* v. *Santana,* 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976). I therefore dissent.

It is useful to begin by clearing away those facts and issues on which this case does not turn. First, it does not turn on the fact, noted in oral argument in this court, that *Santana* was a four justice plurality opinion.[1] None

---

[1] In *Santana,* four justices reasoned that the defendant had been arrested in a public place where she had no reasonable expectation of privacy. *United States* v. *Santana,* 427 U.S. 38, 42, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976). It is this rationale for which *Santana* has generally been cited. One justice concurred on the basis that no warrant was required for an arrest in the home, based upon probable cause, at least where no force was required to enter the home. Id., 43–44. Two justices concurred on the basis that the failure of the police to obtain a warrant was both a justifiable police decision and, if not justified, harmless. Id., 44. Two justices dissented on the basis that any warrantless arrest is invalid absent exigent circumstances. Id., 45.

of the cases cited below or otherwise examined during the course of my research discusses the precedential value of the various opinions in *Santana*. As far as I can tell, the federal and state courts have uniformly considered *Santana* to be binding and authoritative. They may disagree with how far it reaches, particularly after *Payton* v. *New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), but they do not decline to give it proper deference on the basis that its rationale was joined by only four justices. This approach is consistent with other cases based upon four justice rationales that were considered to be the law until the United States Supreme Court specifically said otherwise. Compare, e.g., *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), with *Horton* v. *California,* 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) (inadvertence prong of plain view doctrine), and *United States* v. *Mendenhall,* 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), with *California* v. *Hodari D.,* 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (definition of "seizure" under fourth amendment); see also *Marks* v. *United States,* 430 U.S. 188, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (definition of obscenity).

Second, this case does not turn on the fact that the defendant was standing precisely on the threshold, rather than just inside the threshold, when the police officer arrested him. Despite the footnote in *Santana* detailing that particular location of the defendant in that case, the federal and state cases subsequent to *Santana* have not read it as resting on such a finding. In this respect, I agree with Professor LaFave that the legality of doorway arrests should not "be determined by resort to plumb bob . . . ." 2 W. LaFave, Search and Seizure (2d Ed. 1987) § 6.1 (e), p. 590. The legality of such arrests should, instead, be determined by reference to the reasonable expectation of privacy of

the defendant under the circumstances of the particular case, as I explain in more detail below.

Third, this case does not turn on the fact, also noted in oral argument, that the police arrested the defendant for a misdemeanor, rather than for a felony. I find no support for such a distinction in any of the cases decided after both *Santana* and *Payton,* and I can find no reason rooted in the privacy expectation analysis that would support such a distinction. The issue, in fourth amendment terms, is whether, under the circumstances of the case, the defendant had a reasonable expectation of privacy in the place he occupied, and there is no support for the proposition that such a determination should turn on whether the arresting officer intended to arrest him for a misdemeanor or a felony.

What this case does turn on, in my view, is the intersection of *Santana* and *Payton,* and the implications of that intersection for the doorway arrest situation. My analysis of those implications and of the relevant privacy interests leads me to conclude that the arrest in this case was illegal.

In *Santana,* the police, with probable cause to arrest but without an arrest warrant, drove to Santana's house. They saw her standing in the doorway of her house with a paper bag in her hand. The police then pulled up to within fifteen feet of her and got out of their van shouting "police" and displaying their police identification. As they approached her, Santana retreated into the vestibule of her house. *United States v. Santana,* supra, 40. The court held that: (1) because the defendant was "standing in the doorway of the house" when the police started to arrest her, she "was not in an area where she had any expectation of privacy"; id., 42; and (2) her act of then retreating into her house could not "thwart an otherwise proper arrest." Id.

In my view, as I explain in more detail below, it is critical to a proper reading of *Santana* that the defendant in that case was not standing in the doorway in response to a summons by the police—by knock on the door, ringing of a doorbell or otherwise. This reading of *Santana* is supported, not only by many of the cases that, after *Payton,* have addressed the meaning of *Santana,* but by the fact that society's reasonable expectation of privacy differs depending on whether an individual places herself voluntarily in her doorway, where she is exposed to public view, speech, hearing and touch; id., 42; or whether she is summoned to the door by a knock or ring and opens the door in response thereto.

Four years after *Santana* was decided, the United States Supreme Court decided two appeals, *Payton* v. *New York* and *Riddick* v. *New York,* both referred to under the case name of *Payton* v. *New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). In the *Payton* case, the police, with probable cause but without an arrest warrant, broke down the apartment door of the defendant and entered the apartment. The defendant was not there, but they saw in plain view evidence that was later introduced into evidence against him. Id., 576–77. In the *Riddick* case, the police, again with probable cause but without a warrant, knocked on the front door of the defendant's house. The defendant's young son opened the door, and the police saw the defendant sitting in bed. The police entered the house and arrested the defendant. Incident to the arrest, they performed a search that yielded incriminating evidence. Id., 578.

The court held that both arrests were invalid because the fourth amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Id., 577. With respect to the consent aspect of the *Rid-*

*dick* case, the court concluded that no consent had been given because, although Riddick's three year old son "answered the door, the police entered before Riddick had an opportunity either to object or to consent." Id., 583.

In responding to the state's argument based on a distinction between the intrusiveness of an entry to search for property and an entry to arrest, the court stated that "the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . . [T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id., 589–90.

Following *Santana* and *Payton,* the federal and state courts have struggled with cases in which the police have made warrantless, probable cause arrests at the doorway of a defendant's home following the opening of the door by the defendant in response to a knock on the door by the police. The focus of the inquiry in these cases has been whether the principles of *Santana* or *Payton* apply—whether the arrest was in a public place in which the defendant had no reasonable expectation of privacy, or whether the arrest was made in the home, a place in which the defendant had the highest expectation of privacy.

Not surprisingly, the cases have reached a variety of results, and break down along three principal lines. One line of cases holds generally that an arrest of the

defendant at the doorway of the defendant's home (or hotel or motel room) is valid under *Santana,* irrespective of whether the defendant opened the door in response to a police summons (e.g., by knocking on the door) and irrespective of whether the defendant was precisely *on* the threshold or just inside it. See, e.g., *United States* v. *Carrion,* 809 F.2d 1120 (5th Cir. 1987); *United States* v. *Whitten,* 706 F.2d 1000 (9th Cir. 1983), cert. denied, 465 U.S. 1100, 104 S. Ct. 1593, 80 L. Ed. 2d 125 (1984); *United States* v. *Mason,* 661 F.2d 45 (5th Cir. 1981); *People* v. *Burns,* 200 Colo. 387, 615 P.2d 686 (1980); *Byrd* v. *State,* 481 So. 2d 468 (Fla. 1985), cert. denied, 476 U.S. 1153, 106 S. Ct. 2261, 90 L. Ed. 2d 705 (1986); *People* v. *Morgan,* 113 Ill. App. 3d 543, 447 N.E.2d 1025 (1983); *Costillo* v. *Commissioner of Public Safety,* 416 N.W.2d 730 (Minn. 1987); *State* v. *Howard,* 373 N.W.2d 596 (Minn. 1985); *State* v. *Patricelli,* 324 N.W.2d 351 (Minn. 1982); *Edwards* v. *State,* 808 P.2d 528 (Nev. 1991); see also *United States* v. *Sewell,* 942 F.2d 1209 (7th Cir. 1991), cert. denied, U.S.   , 112 S. Ct. 1567, 118 L. Ed. 2d 213 (1992) (defendant arrested at doorway immediately after engaging in drug sale there with undercover agent; defendant had no reasonable expectation of privacy under circumstances).[2]

A second line of cases holds generally that what would otherwise be a valid doorway arrest under *Santana* may be rendered illegal under *Payton* because the defendant opened the doorway in response to coercive activity of the police outside, such as flooding the home with spotlights and calling to the defendant with bull-

---

[2] It is certainly arguable, however, that *United States* v. *Sewell,* 942 F.2d 1209 (7th Cir. 1991), cert. denied,   U.S.   , 112 S. Ct. 1567, 118 L. Ed. 2d 213 (1992), rests more properly on the narrow ground that an individual who engages in an illegal transaction with a stranger at the doorway has abandoned any otherwise reasonable expectation of privacy in the individual's home. I need not reach that question in this case.

horns, or in response to deception, such as the police misrepresenting their identity when the defendant asked who was there before opening the door. See, e.g., *United States* v. *Edmondson,* 791 F.2d 1512 (11th Cir. 1986); *United States* v. *Al-Azzawy,* 784 F.2d 890 (9th Cir. 1985); *United States* v. *Morgan,* 743 F.2d 1158 (6th Cir. 1984), cert. denied, 471 U.S. 1061, 105 S. Ct. 2126, 85 L. Ed. 2d 490 (1985); *United States* v. *Johnson,* 626 F.2d 753 (9th Cir. 1980), aff'd on other grounds, 457 U.S. 537, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982).

The third line of cases focuses both on whether the defendant opened the door in response to a summons by the police and on the defendant's conduct after opening the door. These cases hold generally that, if a defendant opens the door in response to a police knock and acquiesces to the ensuing arrest, the arrest is valid under *Santana,* but that a defendant, by merely opening the door in response to a knock by the police, does not, without more, surrender a reasonable expectation of privacy in the home under *Payton.* See, e.g., *United States* v. *Berkowitz,* 927 F.2d 1376 (7th Cir. 1991); *United States* v. *McCraw,* 920 F.2d 224 (4th Cir. 1990); *Duncan* v. *Storie,* 869 F.2d 1100 (8th Cir.), cert. denied, 493 U.S. 852, 110 S. Ct. 152, 107 L. Ed. 2d 110 (1989); *State* v. *Schlothauer,* 206 Neb. 670, 294 N.W.2d 382 (1980).

Of all the cases in these three lines, the most persuasive is *United States* v. *Berkowitz,* supra, because it alone focuses on and analyzes the relevant inquiry: the reasonable expectation of privacy of the defendant under the fourth amendment. In *Berkowitz,* the government agents went to the defendant's home to arrest him, armed with probable cause but not with a warrant. It was undisputed that the agents knocked on the defendant's door and that he opened the door in response. Id., 1380. At that point, the stories diverged.

The agents claimed that immediately after the defendant opened the door they told him he was under arrest, and that the defendant did not resist or attempt to close the door but simply asked if he could have his coat. One of the agents retrieved the coat, which was draped over a chair inside the home. Id. The defendant claimed, however, that immediately after he opened the door, the agent stepped into the house and then told the defendant that he was under arrest. Id. Despite this difference between the two versions of the facts, the trial court had not held an evidentiary hearing on the defendant's motion to suppress the evidence that had been gathered as a result of the agents' entry into the defendant's home.

The Seventh Circuit Court of Appeals held that an evidentiary hearing was necessary, because the arrest was legal under the government's version of the facts but illegal under the defendant's version. Id., 1385. After discussing the holdings of both *Santana* and *Payton,* the court stated: "If Berkowitz's arrest occurred as the government says it did, the arrest was legal. Courts have generally upheld arrests such as that described by [the government agent] in this case, where the police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, *and the person acquiesces to the arrest.*" (Emphasis added.) Id., 1386. The court noted that, although such cases have justified their holdings as applications of *Santana,* those cases and the arrest of Berkowitz, as described by the government, were consistent with *Payton:* "It is true that Berkowitz was still standing inside his home when [the agent] told him he was under arrest. But *Payton* prohibits only a warrantless *entry* into the home, not a policeman's use of his voice to convey a message of arrest from outside the home. See [2 W. LaFave, Search and Seizure (2d Ed.

1987) § 6.1 (e), p. 590]. Moreover, there is nothing in *Payton* that prohibits a person from surrendering to police at his doorway." (Emphasis in original.) *United States* v. *Berkowitz,* supra.

The court then turned to the arguments that (1) because Berkowitz had been standing at or near his doorway, he was in a public place under *Santana* and the arrest was therefore legal, and (2) the legality of a search of a home should not turn on such subtle distinctions as whether the police announce the arrest before or after entering the home, so long as they remain near the doorway. The court found these arguments unpersuasive, because "*Payton* holds the Fourth Amendment draws a clear line at the entrance of a person's house"; *United States* v. *Berkowitz,* supra, 1386; and because of the nature of the reasonable expectations of privacy involved.

The court stated: "That warrantless entry before arrest is not legal (and, conversely, that a slight entry after the defendant has submitted to the police is legal) can be seen from analyzing the privacy interests involved in the situation. The Fourth Amendment protects people's legitimate expectations of privacy. A person's subjective privacy expectation in any situation is legitimate, and therefore worthy of Fourth Amendment protection, if it is 'one that society is prepared to recognize as reasonable.' *Minnesota* v. *Olson,* [495 U.S. 91, 95–96, 110 S. Ct. 1634, 109 L. Ed. 2d 85 (1990)] . . . .

"As the Court noted in *Payton,* there is no place where a person's expectation of privacy is greater than in his own home . . . . A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house. We think society would recognize a person's right to choose

to close his door on and exclude people he does not want within his home. This right to exclude is one of the most—if not the most—important components of a person's privacy expectation in his home.

"When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police's authority and stands waiting for the police to take him away can hardly complain when the police enter his home briefly to complete the arrest. . . .

"It is a different matter, however, for the police to enter a person's home, without his consent, before announcing their authority to arrest. In that case, the arrestee has not forfeited his privacy interest in the home; he has not relinquished his right to close the door on the unwanted visitors. . . . Indeed, the police have not even given him the chance to exercise that right." *United States* v. *Berkowitz,* supra, 1387.

The court next addressed the applicability of *Santana,* and concluded that "*Santana* does not require a different result. As far as reasonable privacy expectations go, there is a significant difference between a person who for no reason voluntarily decides to stand in his open doorway, and a person who merely answers a knock on his door. The person who answers the knock and stays within the house is not voluntarily exposing himself 'to public view, speech, hearing, and touch as if [he is] standing outside [his] house.' [*United States* v. *Santana,* supra, 42.]" *United States* v. *Berkowitz,* supra, 1388.

Finally, the court addressed the argument that disallowing the minimal entry in that case could unduly hamstring the police: "But *Payton* forbids any nonconsensual warrantless entry into the home absent exigent circumstances. *Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance. Also, if police go to a person's home to arrest him, and have reason to believe they may have to enter the home to make the arrest, they should obtain a warrant." Id., 1388.

I agree with the reasoning of the court in *Berkowitz*. Although in that case the defendant was just inside the threshold when the police entered and then arrested him, the same reasoning applies to this case, where the defendant was standing directly on the threshold when the police arrested him and where the police did not enter the home but arrested the defendant at his threshold.[3]

In this case, unlike *Santana* and like *Berkowitz,* the defendant opened the door in response to the knock by the police, briefly conversed with the officer, and remained there for a brief period of time at the officer's request.[4] That conduct in and of itself did not mean that he thereby surrendered his reasonable expec-

---

[3] Although I believe that the legality of doorway arrests should not be determined by resort to a plumb bob, I need not reach in this case the situation in which the defendant opens the door in response to a knock by the police and then crosses the threshold voluntarily before the police arrest him.

[4] According to the officer's testimony, the time period between the first conversation with the defendant at the door and the arrest was "[a] couple of minutes." Arguably, if an individual who has opened the door in response to a knock stands in the open doorway for an extended period of time, at some point in time that individual may have abandoned a reasonable expectation of privacy in the home. Assuming without deciding that to be true, I do not believe that to be so in this case, where the defendant initially asserted his right to privacy in his home by refusing the police entry without a warrant, and where he then, after a request by the police, stood in the doorway for two minutes.

tation of privacy in his home. Our expectations of privacy are at their highest in our own homes. I do not believe that we abandon those expectations merely by answering the doorbell (or in response to a knock) and standing briefly in the threshold.

We answer our doorbells under a variety of circumstances, ranging from the situation where we expect a visit by family or friends, to the unexpected and unwanted attempted intrusion of the door-to-door solicitor. We open the door in a variety of ways and to a variety of degrees, ranging from the opening wide in order to welcome the visiting friend, to the wary and narrow opening in order to ward off politely but firmly the unwelcome stranger. When we open the door, we may stand just inside the threshold or may place ourselves squarely thereon. In all of these situations, however, we do not abandon our right to close the door and exclude the person at the door simply because we have opened it and are standing there briefly. By opening the door in response to a ring or knock, and standing there briefly so that our feet are on the threshold rather than just inside it, we do not abandon our heightened expectation of privacy in our homes and place ourselves in a public place. See *United States* v. *Berkowitz,* supra.

Furthermore, in this case the defendant did not acquiesce in the arrest. Compare *United States* v. *Berkowitz,* supra. The testimony of the police officer indicates that, in their first conversation at the door, the defendant firmly refused the officer's request to enter the house to search for a gun and told the officer to "get a search warrant." The defendant remained in the doorway for a brief period of time only because the officer requested that he do so. That was merely a continuation of his opening of the door in response to the officer's knock, and could not, without more, constitute an abandonment of his expectation of privacy in his home.

Finally, there is no evidence in this case that the officer gave the defendant the opportunity to submit to the arrest, and the trial court specifically found that the defendant "stepped back when he was told he was under arrest." See *Payton* v. *New York,* supra; *United States* v. *Berkowitz,* supra. This conduct of the defendant can only be taken as an assertion of his right to privacy in his home by attempting to retreat therein and to exclude the warrantless police.

I therefore conclude that the arrest of the defendant was illegal. Because this conclusion is dispositive of the three certified questions, I would affirm the judgment of the Appellate Court.

BERDON, J., dissenting. Today, a majority of three upholds the defendant's conviction—a conviction predicated on the violation of his fourth amendment right of privacy in his home—on the basis of a narrow reading of *United States* v. *Santana,* 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976), and an inappropriate application of *Payton* v. *New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

The facts of this case underscore the importance of the right of privacy in the home. The only charge that purportedly justified the state's invasion into the defendant's home was the threatening charge, a misdemeanor. That charge was nolled. Instead, the defendant entered a plea of nolo contendere to the possession charges, which were predicated on the trace of narcotics found in a pipe that was obtained only as a result of the police invasion into the defendant's home.[1] The

---

[1] General Statutes § 54-94a provides in part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within

defendant was substantially penalized as a result of the intrusion into his home by a four year suspended sentence and four years of probation.

I would opt for the continuation of this case until it can be heard before an en banc court of seven justices. This is a case of importance to every citizen because it implicates the constitutional right of privacy in the home, a protection that is at the core of both the fourth amendment to the United States constitution and article first, § 7 of the Connecticut constitution.[2] In this decision, the majority gives the state an invitation to invade the privacy of the home of every citizen by holding that the police were within the bounds of the fourth amendment when they arrested the defendant after securing his presence at the doorway by enticing him there with a knock on the door.

the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ."

[2] The majority points out that the defendant "abandon[ed] any argument pertaining to the Connecticut state constitution." The defendant raised the issue of privacy under article first, § 7 of the Connecticut constitution in the Appellate Court, but failed to raise it here as an alternative ground to affirm the Appellate Court's judgment. Although the defendant failed to analyze appropriately these state constitutional grounds in the Appellate Court, we should nevertheless order supplemental briefs on the issues. Faced with inadequate briefs on a state constitutional issue, concerned with doing justice, and recognizing the importance of developing a state constitutional jurisprudence, the Vermont Supreme Court ordered rebriefing in a similar situation in which the parties failed to present substantive analysis of the state constitutional issue. *State* v. *Jewett,* 146 Vt. 221, 500 A.2d 233 (1985). It is clear that "this court is authorized to rely upon alternative grounds supported by the record to sustain a judgment." *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 461, 521 A.2d 1040 (1987); C. Tait, Connecticut Appellate Practice and Procedure (1989) § 7.14.

It is well established that "federal constitutional and statutory law establishes a *minimum* national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. (Emphasis added.) *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984)." (Internal quotation marks omitted.) *State* v. *Barton,* 219 Conn. 529, 546, 594 A.2d 917 (1991).

I begin my analysis by establishing what this case is not about. It is not a case about exigent circumstances allowing warrantless entry into the home, as in *United States* v. *Zabare,* 871 F.2d 282 (2d Cir.), cert. denied, 493 U.S. 856, 110 S. Ct. 161, 107 L. Ed. 2d 119 (1989) (likelihood of destruction of evidence and imminent danger to law officers or other persons); *United States* v. *Cattouse,* 846 F.2d 144 (2d Cir.), cert. denied, 488 U.S. 929, 109 S. Ct. 316, 102 L. Ed. 2d 335 (1988) (likelihood that the defendant will escape undetected); *United States* v. *Shelton,* 737 F.2d 1292 (4th Cir. 1984) (hot pursuit of suspects and warrantless entry necessary to prevent destruction of evidence); *United States* v. *Newbern,* 731 F.2d 744 (11th Cir. 1984) (risk of other suspects alerting the defendants of the imminence of arrest, thereby creating risk of escape and destruction of evidence); see also *United States* v. *Reed,* 572 F.2d 412, 424 (2d Cir.), cert. denied sub nom. *Goldsmith* v. *United States,* 439 U.S. 913, 99 S. Ct. 283, 58 L. Ed. 2d 259 (1978) (indicating factors utilized to establish exigent circumstances, such as the gravity of the offense, whether the suspect is armed, the probable cause to believe the suspect committed the crime, and the peaceful circumstances of the warrantless entry). Nor is this case about the emergency doctrine, which allows an officer to make a warrantless entry into the home when the officer reasonably believes that a person within is in need of immediate aid. *State* v. *Geisler,* 222 Conn. 672, 691, 610 A.2d 1225 (1992).

At issue in this case is whether an individual who responds to a knock on the door has a legitimate expectation of privacy, whether the knock on the door comes from the police or from a member of the general public. I write separately to make it clear that the constitutional right of privacy in the home and the curtilage of the home, under the state or the federal constitution, is not lost simply because a person responds to

a knock on the door. An individual's expectation of privacy cannot be diminished or defined by the status of the person who chooses to knock on the door. Indeed, the privacy extends to the home and its curtilage whether or not the person is in plain view.

In our analysis, we should not get caught up in *Payton's* metaphoric phrase that the "threshold may not reasonably be crossed without a warrant"; *Payton* v. *New York,* supra, 590; as setting the bounds of the right of privacy in the home under the fourth amendment. "Since the decision in *Katz* v. *United States,* [389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967),] it has been the law that capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. . . . A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable . . . ." (Citations omitted; internal quotation marks omitted.) *Minnesota* v. *Olson,* 495 U.S. 91, 95–96, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990).

The expectation of privacy reaches its highest level when it involves the home. In *State* v. *Geisler,* supra, 687–88, we recognized that "[t]he sanctity of the home has a well established place in our jurisprudence. The English common law, upon which much of this country's constitutional and common law is based, recognized that intrusion into the home constituted especially egregious conduct. From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the

arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle: The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter — all his force dares not cross the threshold of the ruined tenement! *Miller* v. *United States,* 357 U.S. 301, 306–307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958). In discussing burglary, defined as nocturnal house-breaking, Blackstone wrote, [a]nd the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity . . . . 4 Blackstone's Commentaries (1822) p. 222." (Internal quotation marks omitted.)

*Santana* and *Payton*[3] were never intended to set the threshold of the door as the litmus test for determin-

---

[3] *United States* v. *Santana,* 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976), must be limited by its factual underpinnings — that is, the exigent circumstances. "The decision was justified by the significant risk that the marked money would no longer be in Santana's possession if the police waited until a warrant could be obtained." Id., 44. (Stevens, J., concurring.) Indeed, that is the basis for which *Santana* has been subsequently cited. *Steagald* v. *United States,* 451 U.S. 204, 221, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981) ("warrantless entry of a home would be justified if the police were in 'hot pursuit' of a fugitive"); see also *Segura* v. *United States,* 468 U.S. 796, 812, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); *Welsh* v. *Wisconsin,* 466 U.S. 740, 749, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984). Likewise, the Second Circuit Court of Appeals has cited *Santana* for the proposition that "the burden of establishing exigent circumstances [is] satisfied where the law enforcement officers have been in pursuit of a fleeing felon whose arrest was first attempted in public." *United States* v. *Perez,* 904 F.2d 142, 150 (2d Cir.), cert. denied, 498 U.S. 905, 111 S. Ct. 270, 112 L. Ed. 2d 226 (1990). Generally, the Second Circuit has relied on *Santana* to support a "hot pursuit" finding of exigent circumstances in order to uphold the reasonableness of a warrantless, in-home arrest effectuated after

ing where privacy of the home begins and ends. *Oliver v. United States,* 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), decided four years after *Payton,* made it crystal clear that the United States Supreme Court did not abandon the curtilage test for determining "the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life . . . and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area *immediately adjacent to the home* will remain private." (Citation omitted; emphasis added; internal quotation marks omitted.)

I agree with the Appellate Court in this case when it held that the defendant's porch was part of the curtilage of his home and that he was therefore entitled to the same constitutional right of privacy on his porch as he would be if he were in the house with the doors

---

the arresting officer pursues the defendant into the home following an arrest attempted in a public place. See *United States* v. *Crespo,* 834 F.2d 267, 271 (2d Cir. 1987), cert. denied, 485 U.S. 1007, 108 S. Ct. 1471, 99 L. Ed. 2d 700 (1988) (*Santana* was not applied to a warrantless in-home arrest based on exigent circumstances because "there was technically no flight from a public to private place so as to bring *Santana* into play").

Likewise, the decision in *Payton* v. *New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), must be viewed within the context of its facts. In both of the *Payton* factual scenarios, the police invaded the homes of the defendants to make warrantless arrests. The issues before the court were not the spatial limits of the right of privacy of the home protected by the fourth amendment. The issue was simply whether absent exigent circumstances the police can forcibly enter a person's home to make a warrantless arrest when they have probable cause to believe the person committed a crime.

closed.[4] The Appellate Court held that a "sheltered porch, attached to a home, is an area intimately tied to the home itself, and an area in which domestic activity commonly occurs. A porch is intrinsically associated with both the sanctity of the home and the privacies of life. See *Oliver* v. *United States,* supra, 180; *Boyd* v. *United States,* 116 U.S. 616, 630, 6 S. Ct. 524, 29 L. Ed. 746 (1886). We hold that the defendant's porch, in which he had exclusive possession, is as sacrosanct as the home itself for fourth amendment purposes. Other courts have similarly held that certain areas attached to the home are to be treated as though they are a part of the home." *State* v. *Santiago,* 26 Conn. App. 481, 489–90, 602 A.2d 40 (1992).

The arrest in this case was undoubtedly illegal, however, even if one rejects the well established right to privacy within the curtilage of the home. The defendant did not abandon his expectation of privacy in his home simply by answering the door. The majority, purportedly relying on *Santana,* fails to reach the narrow issue of whether a person relinquishes his or her privacy rights merely by opening the door in response to a knock; rather, the predicate for the majority's decision is that the defendant "willingly remained on his doorstep at the *request* of the police." (Emphasis added.)

---

[4] Indeed, Justice Marshall in *Oliver* v. *United States,* 466 U.S. 170, 195–96, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1983), joined by Justices Brennan and Stevens, makes a powerful argument for the following bright line rule. "A clear, easily administrable rule emerges from the analysis set forth above: Private land marked in a fashion sufficient to render entry thereon a criminal trespass under the law of the State in which the land lies is protected by the Fourth Amendment's proscription of unreasonable searches and seizures. One of the advantages of the foregoing rule is that it draws upon a doctrine already familiar to both citizens and government officials. In each jurisdiction, a substantial body of statutory and case law defines the precautions a landowner must take in order to avail himself of the sanctions of the criminal law. The police know that body of law, because they are entrusted with responsibility for enforcing it against the public; it therefore would not be difficult for the police to abide by it themselves." Id.

Simply put, that is not this case. The so-called "request" was an "order" by the police officer to remain at the open door while he left to consult with his superior after the defendant opened the door in response to the officer's knock.[5] A person's compliance with a show of police authority does not jeopardize that person's constitutional rights. See *State* v. *Oquendo,* 223 Conn. 635, 653, 613 A.2d 1300 (1992); *State* v. *Ostroski,* 186 Conn. 287, 291–92, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982) (person is "seized" when freedom of movement is restrained by physical force or *show of authority*).

At the very least, even under the restrictive readings of *Santana* and *Payton,* this case fits the mold of *United States* v. *Berkowitz,* 927 F.2d 1376 (7th Cir. 1991). As the court pointed out in *Berkowitz,* the "person who answers the knock and stays within the house is not voluntarily exposing himself 'to public view, speech, hearing and touch as if [he is] standing completely outside [his] house.' " Id., 1388, quoting *United States* v. *Santana,* supra, 42. Accordingly, in *Berkowitz* the court remanded the case for an evidentiary hearing to determine whether the Internal Revenue Service agents had asserted their authority before they entered the defendant's home to arrest him and whether the defendant had acquiesced to their authority.

Justice Marshall put it quite well when he wrote: "The Fourth Amendment, properly construed, embodies and gives effect to our collective sense of the degree to which men and women, in civilized society, are entitled 'to be let alone' by their governments. *Olmstead* v. *United States,* [277 U.S. 438, 478, 48 S. Ct.

---

[5] As the Appellate Court noted, "[t]he officer *ordered* the defendant to remain in the doorway . . . ." (Emphasis added.) *State* v. *Santiago,* 26 Conn. App. 481, 484, 602 A.2d 40 (1992).

564, 72 L. Ed. 2d 944 (1928)] (Brandeis, J., dissenting) . . . . The Court's opinion bespeaks and will help to promote an impoverished vision of that fundamental right." (Citation omitted.) *Oliver* v. *United States,* supra, 197 (Marshall, J., dissenting). Likewise, the majority in this case impoverishes our vision of that right " 'to be let alone.' " Id.

I would reverse the judgment denying the defendant's motion to suppress the evidence seized by the police when he was arrested at the threshold of his home and remand the case for further proceedings.

Accordingly, I dissent.