# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3872

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAPO ADEYEYE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 233—**Wayne R. Andersen,** *Judge.*

———————

ARGUED SEPTEMBER 5, 2003—DECIDED FEBRUARY 20, 2004

———————

Before BAUER, POSNER, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Dapo Adeyeye pled guilty to knowingly and intentionally possessing with intent to distribute approximately one kilogram of a mixture containing heroin, in violation of 21 U.S.C. § 841. His plea reserved the right to appeal the district court's denial of his motion to suppress and his sentence, and he now appeals both.

He contends that the district court erred in denying his motion to suppress the heroin discovered in his hotel room because the search violated the Equal Protection Clause

and because his consent to the search was not voluntary. In addition, he challenges the sentence imposed by the district court, asserting that the court erred in determining that he did not qualify for the two-level "safety valve" reduction under U.S.S.G. § 2D1.1(b)(6) and U.S.S.G. § 5C1.2.

The trail that led to Adeyeye was a fortuitous one for law enforcement, if not for Adeyeye. The case originated with Customs Inspector Susan Papa, who was working at O'Hare International Airport checking computerized airline reservation information in an effort to identify potential khat smugglers.[1]

Papa eventually focused on a traveler named Melvin Reynolds as a potential smuggler. The factors that caused Papa to inquire further about Reynolds were fairly innocuous: he was a British citizen as were most of the khat smugglers; and he had no prior travel to the United States. Other known khat smugglers either had a lot of recent travel or else none at all. Papa then determined that Reynolds had used a travel agency that had been used by khat smugglers in the past, and had booked his reservation only two days in advance, another red flag. Finally, Papa testified that his length of stay—three weeks—was significant. In her experience, khat smugglers often booked their reservations for two to three weeks of travel, only to turn around and return home quickly after arrival.

Papa then retrieved Reynolds' Customs' declaration, which indicated his United States address would be the Heart of Chicago Motel. That motel was on a list given by Customs agents of motels and hotels in the Chicago area at which they had encountered narcotics activity. Papa then

---

[1] Khat is a plant from which the leaves are harvested, which are chewed or brewed into tea to produce a stimulant effect on the central nervous system. *United States v. Hussein*, 351 F.3d 9, 11 (1st Cir. 2003).

contacted another agent, Jim Stewart, to inquire if it was possible that a legitimate foreign traveler would be going to that motel, because there were other hotels and motels on the list that foreign travelers would normally frequent. The agent informed Papa that no travel agent would recommend the Heart of Chicago Motel to a foreigner. Papa informed Stewart that the flight had arrived at approximately 10:30 that morning.

Agents Stewart and Coleman then proceeded with the investigation. They contacted the motel and inquired whether a person named Melvin Reynolds had checked in shortly before the call, and were informed that no one had registered in that name. They then asked if anyone had checked in at that time, and were told there was a foreign individual who had arrived named Dapo Adeyeye. The motel clerk further informed them that Adeyeye had paid for the room in cash. The check-in time was consistent with the time that the agents would have expected Reynolds to reach the hotel given his flight time. The agents recognized the name Adeyeye to be of Nigerian origin, but had no information as to the race or ethnicity of Reynolds other than that he was a British citizen. Based on the information before them, the agents decided to proceed to the motel to determine whether the person staying there was Reynolds registering under an alias.

When they arrived at the motel, the manager informed them that Adeyeye had been to the motel previously, and that he requested the same room as the prior occasion. (There was no testimony that Papa had informed the agents that it was Reynolds' first trip to the United States, so the information regarding his prior stay at the motel did not cause them to question whether the traveler was Reynolds.) The room was on the first floor in a more obscure area not visible from the street. The agents proceeded to the room, and knocked identifying themselves as police. They heard muffled sounds inside the room, and after several minutes

they knocked again. At that time, they said that if it was an inconvenient time they could come back later. Adeyeye's testimony at the hearing corroborated the agents' testimony regarding the multiple knocks and the offer to return at a later, more convenient time. Adeyeye then opened the door, and they identified themselves as police and asked if they could come in and ask him a few questions. He agreed, and they advanced to the foyer area of the room.

The defendant identified himself as Dapo Adeyeye and stated that he had flown into Chicago from New York. In response to questions, he said he did not have any identification with him, and that he did not have his airline tickets because he discarded them at the airport. He further responded that he had some money with him, but no weapons or narcotics. From their vantage point in the room, the agents could see zip-lock sandwich bags on the bed and noticed that Adeyeye was very tense and rigid. They asked him whether he would consent to a search of his belongings, and he responded in the affirmative. In the luggage on the bed, the agents discovered thirteen packages of white powder wrapped in plastic wrap. One agent, upon seeing the packages, asked "what is it?" and Adeyeye answered that it was heroin. Adeyeye was then placed under arrest and given his *Miranda* warnings. He then provided additional information to them, including a statement that his prior stay at the motel was to smuggle heroin, and that the amount was greater on that occasion. The search of the motel room revealed a scale, a ledger which correlated with the packages of heroin found, and a picture of a woman who Adeyeye identified as a drug courier. They also found an Amtrak train ticket issued the previous day for New York to Chicago, indicating that he had traveled by train rather than by plane as he had indicated. The agents also discovered identification in the name "Dapo Adeyeye." As it turns out, Adeyeye had no relationship to Reynolds, but had the

misfortune of checking in at a time consistent with the trail left by Reynolds.[2]

Adeyeye first argues that the agents violated his equal protection rights by relying on an impermissible factor of ethnicity in singling him out for investigation. He does not allege a broad discriminatory policy or practice by the agents to target Nigerian nationals, but rather claims that "in his specific case the officers' sole reason for approaching him on March 29, 2000 at the Heart of Chicago Motel was his Nigerian background, as exemplified by the officers' own testimony." The fatal flaw in that argument is that there is no such testimony at the suppression hearing.

The statements which Adeyeye cites in support of his argument are hearsay statements by a DEA agent introduced at the preliminary hearing to determine whether there was probable cause to detain Adeyeye. The agent testified that Customs officials called the Heart of Chicago Motel to ask if Reynolds had checked in, and then inquired if any other Nigerian nationals had checked in that morning. The district court at that hearing noted the problematic nature of hearsay testimony, but acknowledged that such statements could be considered at that stage. *See* Fed. R. Crim. P. 5.1(e) (Committee Note to 2002 amendment stating that federal law is now clear that a finding of probable cause can be based upon hearsay, and therefore eliminating need for explicit language to that effect previously in 5.1(a)). At the suppression hearing, however, Adeyeye did not attempt to either introduce that testimony or to use it to impeach the testimony of the Customs agents. In contrast to the preliminary hearing, the testimony at the suppression hearing was provided by the Customs agents with personal knowledge of what happened. Papa testified

---

[2] Incidentally, Reynolds was arrested a month later as he entered through JFK airport and a search revealed khat.

that Reynolds was singled out because he was a British citizen, traveling for a time period consistent with that of prior khat smugglers, using a travel agent previously used by such smugglers, and staying at a hotel that no travel agent would recommend to a legitimate foreign traveler. Stewart and Coleman testified that they proceeded to the motel based on those factors once they determined that a foreign national had indeed checked into the motel at a time consistent with Reynolds' travel schedule. They questioned the motel manager in an effort to further determine the identity of the motel guest, and learned that he had requested a particular room which is obscured from view, and that he paid cash for the room, thus leaving no credit card trail for them to explore. Adeyeye did not cross-examine them as to any inconsistency between their statements and those made by the DEA agent at the preliminary hearing. In fact, the relevant testimony at the suppression hearing was uncontradicted, and there was no basis to find that Adeyeye was singled out because of his ethnicity.

Adeyeye next contends that the agents lacked reasonable suspicion to approach him in his hotel room. The government counters that no such suspicion is required for agents to knock on a door and ask some questions, and that the standard is met in any case.

In *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997), we considered the appropriate scrutiny to apply to the "knock and talk" procedure wherein officers approach a residence in which they suspect illegal activity is occurring, knock on the door, and then attempt to gain consent to enter. The court noted that as a general matter, officers may approach a willing person in a public place and ask that person questions without violating the Fourth Amendment. *Id.* at 689. There is no seizure of the person in those circumstances unless the person would not have felt free to leave. *Id.* Where officers are approaching a person in

a confined space, however, such as a bus, the free-to-leave question is unhelpful. In such a circumstance, " 'the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter.' " *Id.*, *quoting Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see also United States v. Drayton*, 536 U.S. 194 (2002) (reaffirming that the appropriate inquiry is whether the person would feel free to terminate the encounter). In *Jerez*, the police encounter was substantially more intrusive than is present here, and in fact rose to the level of a seizure requiring reasonable suspicion. The officers in that case approached the motel room at 11 p.m., and took turns knocking on the door for several minutes. *Jerez*, 108 F.3d at 687. At one point, one of the officers commanded, "Police. Open up the door. We'd like to talk to you." *Id.* Dissatisfied with the lack of response from the occupants who appeared to be ignoring the knocks, one officer then went to the window and began knocking on the window as well as shining his flashlight through the window into the room, while the other officer continued knocking on the door. *Id.* After a couple of minutes, the occupant came to the door and allowed the officers entrance. *Id.*

We held that the relevant inquiry for the motel occupants, as for the bus passengers, is whether they would feel free to decline the officers' request that they come to the door, or would feel free to otherwise terminate the encounter. *Id.* at 689-90. The test is an objective one and requires consideration of the totality of the circumstances. *Id.* at 690; *Drayton*, 536 U.S. at 201. The conduct of the officers in *Jerez* conveyed the message that compliance with their requests was required. *Jerez*, 108 F.3d at 692. The totality of the circumstances—including the late hour which increases the intrusiveness, the prolonged knocking, the commands and requests to open the door, and the extension of the knocking to the window combined with the use of the flashlight—all transformed the situation from a consensual

encounter into an investigatory stop. *Id.* As a seizure, it could be justified only if the officers had reasonable suspicion supported by articulable facts that criminal activity may have taken place. *Id.* at 693.

The present case contrasts sharply with the *Jerez* conduct. In this case, the officers approached the room in the middle of the afternoon. The knocked only twice, stating at the time of the second knock that they could return later if it was an inconvenient time. Adeyeye acknowledges hearing the officers make that statement. A reasonable person in that position, having been provided the alternative of telling the officers it was an inconvenient time, would have felt free to terminate the encounter. There is no contrary testimony that would lead us to conclude this was a seizure rather than a consensual encounter. Accordingly, there is no need to inquire whether the officers had reasonable suspicion for an investigatory stop. *See also United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (encounter consensual where the officer knocked on motel room door but did not demand that the defendant open the door and was not unreasonably persistent in her efforts to obtain access to the room).

Adeyeye also contends that the court erred in holding that he voluntarily consented to the search of his room. He argues that because the court granted the motion to suppress the statements he made to the officers, and those statements were made in the same coercive atmosphere, that it is inconsistent to hold that his consent was voluntary. There is no such inconsistency, however, when the sequence of events is considered. Adeyeye gave his consent to the search at the outset to the two agents then present in the foyer. Upon discovering the white packages in the luggage, the agent then asked Adeyeye what it was without first giving Adeyeye his *Miranda* warnings, and Adeyeye acknowledged that it was heroin. At that point, the *Miranda* warnings were provided. The district court

suppressed all of the statements because the initial state-
ment was provided without *Miranda* warnings, and the
subsequent statements were made in the context of that
prior statement already having been given. The court also
noted that while both agents testified Adeyeye was given
*Miranda* warnings, neither testified as to who provided it
and what actually was said. Given the relatively chaotic
atmosphere in the room by that point because there were a
number of agents present along with Agents Stewart and
Coleman, the lack of specificity as to what was actually said
to Adeyeye, and the context of the prior inculpatory state-
ment having already been made by Adeyeye, the court held
that all of the statements should be suppressed. None of
those factors considered by the court impacted the vol-
untariness of the initial consent, and therefore there is no
inconsistency in the court's holding.

Finally, Adeyeye contends that he was entitled to the
"safety valve" reduction under U.S.S.G. § 2D1.1(b)(6). He
concedes that in order to be entitled to that reduction, he
must meet each of the five criteria set forth in U.S.S.G.
§ 5C1.2. The dispute is whether he satisfied one of those
criteria, which requires that the defendant had "truthfully
provided to the government all information and evidence
the defendant has concerning the offense or offenses that
were part of the same course of conduct or of a common
scheme or plan." U.S.S.G. § 5C1.2(a)(5). At his sentencing
hearing and his proffer, Adeyeye maintained that March 29,
2000 was the first time he had ever participated in heroin
trafficking. That conflicted with a statement he gave to the
officers at the time of his arrest, in which he acknowledged
he had stayed at the Heart of Chicago Motel one month
earlier and had transported a large quantity of heroin at
that time to the same contact person as for this delivery.
The registration clerk at the Heart of Chicago Motel
corroborated that earlier statement in that he stated that
Adeyeye stayed at the motel a month earlier and that he

requested the same room on March 29, 2000 as he had previously occupied. The district court held that the earlier statement admitting to the prior transaction was more credible, and there is no reason to disturb that finding. *United States v. Alvarado,* 326 F.3d 857, 860 (7th Cir. 2003) (review of the district court's findings about the factual predicates for the safety valve is for clear error only); *United States v. Williams*, 202 F.3d 959, 964 (7th Cir. 2000). Furthermore, given that the earlier transaction was close in time, involved the same type of drug, the same contact person, and even the same locale right down to the specific motel room, the court did not err in holding that it was part of the same course of conduct or common scheme or plan, and therefore that he was not entitled to the reduction. The decision of the district court is AFFIRMED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*