**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John JOHNSON, Defendant–Appellant.**

No. 03–3364.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 2004.

Decided Aug. 18, 2004.

Barry D. Glickman, Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

John A. Goodridge, Evansville, IN, for Defendant–Appellant.

Before CUDAHY, RIPPLE, and WILLIAMS, Circuit Judges.

## ORDER

In February 2003 John Johnson consented to a search of his house, and detectives found crack cocaine inside. Johnson attempted to suppress the evidence on the grounds that his consent was not voluntary and, regardless, it was tainted by his own prior illegal detention. The district court refused to suppress the drugs, and after a jury trial Johnson was convicted of possession with intent to distribute crack cocaine. *See* 21 U.S.C. § 841(a)(1). He was sentenced to 240 months' imprisonment, 10 years' supervised release, and a $100 assessment. *See id.* §§ 841(b)(1)(A), 851. Johnson appeals the district court's ruling on the motion to suppress. We remand for the limited purpose of allowing the district court to make additional findings of fact, and to analyze Johnson's motion in light of those findings.

The following facts are taken from the hearing on the motion to suppress. At about 8:00 p.m. on Thursday, February 27, 2003, Stephon Blackwell, a detective for a Madison County, Indiana, narcotics task force, received an anonymous telephone tip that a "John Johnson" had gone to Muncie, Indiana, to pick up a large amount of crack and had brought back to his house at the "Fulton Street address" in Anderson, Indiana. The anonymous tipster said that Johnson usually picked up crack shipments on Thursdays, and that if he was not at home he would be driving around in a white vehicle. The caller did not give a specific address, any further information about the vehicle, or any information about the basis of her knowledge. (Blackwell assumed from the sound of the voice that the tipster was female.)

Shortly after the call, Blackwell and another detective, Cliff Cole, went to defendant Johnson's residence "to perform a stop and knock." It is not clear how Blackwell settled on this particular John Johnson or determined his exact address, but Blackwell testified that he knew Johnson from growing up. When the detectives arrived at Johnson's house, they saw a white car in the driveway with the engine running. The two detectives parked near the residence and watched it for approximately five minutes. Then they pulled into the driveway, parked behind the white car, and saw a woman leave the

house. The detectives spoke with the woman, later identified as Johnson's girlfriend, Katina Currie, and she verified that Johnson lived there and was home. The detectives asked Currie to knock on the door. She did and Johnson answered.

Johnson opened both the main door and a storm door in order to talk to the detectives. Blackwell told Johnson about the anonymous tip and asked to search the house. Johnson, whom the detectives said was agitated and speaking loudly, denied that there were any drugs in the house. The detectives testified that Johnson never directly refused permission to search but continued denying that there were drugs in the house. Blackwell and Johnson continued to converse for four to six more minutes. There was disputed testimony about the content of their conversation. Currie, who had gone back inside the house during the encounter, testified that she heard Johnson tell Blackwell to obtain a search warrant and the detective respond that he was reluctant to wake a judge that late. The detectives denied that there was any conversation about a search warrant. The district court never resolved the dispute, except to say that the evidence did not establish that the detectives made idle threats in order to gain Johnson's consent to search the house.

After a few more minutes, Johnson turned away from the detectives and retreated into the house and down a hallway. Johnson's retreat prompted Blackwell to pull his gun out of its holster, point it at the ground, and tell Johnson, "[N]ow if you go down that hallway, John, now it's an officer safety issue." Johnson turned to look back at the detective, then fully turned his body around, and according to Blackwell, appeared to relax. Blackwell then reholstered his weapon and continued to request that Johnson allow him to search the residence, while Cole went to

the police vehicle to page the detectives' supervisor. Cole returned and gave a phone to Blackwell, at which point Johnson said, "Well, you might as well come on in." As soon as the detectives entered, Johnson told them, "You guys go ahead and search." The detectives then entered the house and ultimately found a package of crack cocaine in a dresser.

■ On appeal Johnson argues that his consent to search was involuntary. He says he was coerced into consenting because the detectives improperly suggested that they were getting a warrant and because Blackwell had pulled his weapon out. The district court determined that under the totality of the circumstances Johnson's consent was not coerced, a factual finding that we review for clear error. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Strache,* 202 F.3d 980, 984–85 (7th Cir.2000). Although baseless threats to obtain a warrant may vitiate consent, *United States v. White,* 979 F.2d 539, 542 (7th Cir.1992), the district court concluded that the detectives had not made baseless threats in order to gain Johnson's consent. Johnson has not pointed to any reason to disagree with the district court's conclusion on this point. Regarding Blackwell's weapon, this court has held that a brief display of a weapon does not vitiate valid consent. *See United States v. Rojas,* 783 F.2d 105, 108–09 (7th Cir.1986). Blackwell displayed his weapon for no more than 10 seconds, he never pointed it at Johnson, and he reholstered it before Johnson gave his consent to search the house. There is no indication that Johnson's consent was rendered involuntary by any of the police conduct.

■ Johnson also argues that, notwithstanding whether his consent was voluntary, it was tainted by the fact that the officers subjected him to an illegal deten-

tion. "Consent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact 'sufficiently an act of free will to purge the primary taint' of the unlawful seizure." *McGann v. Northeast Ill. Reg'l Commuter R.R. Corp.,* 8 F.3d 1174, 1184 (7th Cir.1994) (quoting *Wong Sun v. United States,* 371 U.S. 471, 483, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The government must carry a "heavy burden" of showing that consent is purged of a primary taint, and the important factors are the temporal proximity of an illegal detention to the consent, the presence of intervening factors between the two events, and the nature and circumstances of the official misconduct. *See United States v. Jerez,* 108 F.3d 684, 695 (7th Cir.1997). When the consent to search is given contemporaneously with the detention, the government is unlikely to carry its burden. *See id.; McGann,* 8 F.3d at 1184. In this case, Johnson's consent came soon after Blackwell's display of a gun and the potentially illegal seizure, and was in response to Blackwell's continued requests for consent. Furthermore, there were no intervening events to break the causal chain. So if Johnson was illegally seized, his consent was tainted by the illegal seizure.

When the police approach a person in a confined space, the test for whether a seizure has occurred is "whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also United States v. Adeyeye,* 359 F.3d 457, 462 (7th Cir.2004); *Jerez,* 108 F.3d at 689. In considering whether Johnson was seized during his encounter with the detectives, the district court said:

> [T]he parties presented no facts suggesting that Defendant experienced any form of 'detention.' The exchange took place at Defendant's front porch and front door, with both detectives standing outside the threshold of the door prior to gaining consent to search. The officers neither made any statements nor exhibited any behavior that would reasonably have indicated to Defendant that he was not free to leave the conversation.

(Dist. Ct. Order at 9). The court then pointed out that Johnson must have felt free to leave when he retreated into the house.

We agree with the district court that Johnson was not seized when the detectives first approached the house to perform the stop and knock. *See Adeyeye,* 359 F.3d at 462 (approving of the "knock and talk" technique of investigation). But then when Johnson tried to end the encounter by retreating into the house, detective Blackwell stopped him in his tracks by pulling a gun out and warning Johnson not to walk further into the house. A seizure can occur when an officer " 'by means of physical force or show of authority has in some way restrained the liberty of a citizen.' " *United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Courts look at the totality of the circumstances to assess whether a seizure has occurred, and one circumstance that suggests a seizure is a "display of a weapon by an officer." *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870. Another indication of a seizure is when an officer "refuse[s] to take 'no' for an answer." *Jerez,* 108 F.3d at 692. For example, in *Jerez* officers persistently knocked on a hotel room door and window, at night, when the occupants were sleeping, until the occupants finally answered the door. In that case, because the officers persisted in the face of the suspects' silent refusal to answer the door, the officers communicat-

ed to the suspects that they had to comply with their request. *Id.* In this case Blackwell refused to let Johnson end the encounter by retreating into the house, and Blackwell even drew his weapon to ensure that Johnson complied. The district court erred in concluding that Johnson was never seized during this encounter.

■ The seizure may have been justified if the detectives possessed reasonable suspicion that Johnson had been, was, or was about to engage in criminal activity. *See Terry,* 392 U.S. at 22, 88 S.Ct. 1868; *United States v. Mancillas,* 183 F.3d 682, 695 (7th Cir.1999). In this case, the detectives were proceeding on the basis of an anonymous tip, and they had no information about the reliability of the tipster. Although the tip contained some prediction about Johnson's future activities that the officers could have tried to verify, specifically that Johnson traveled on Thursdays, the officers detained Johnson before verifying that information. *Compare Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (finding anonymous tip sufficient because caller's accurate predictions about suspect's future behavior were indicia of reliability), *with Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous tip insufficient because it lacked indicia of reliability and lacked predictions about future behavior that would allow the officers to test the tipster's reliability). In addition to the tip, the officers knew that Johnson had a criminal history for a drug offense, which may permissibly add to an officer's suspicion. *See United States v. Finke,* 85 F.3d 1275, 1282 (7th Cir.1996).

It is a close question whether the tip and Johnson's criminal history alone would have provided the officers with reasonable suspicion that he was engaged in or about to engage in criminal activity. Both officers also testified that Johnson was nervous and speaking in a loud voice during the encounter, (Suppression Hr'g Tr. at 17–18, 53–56), and officer Blackwell said he thought that when Johnson retreated into the house he was going to get a weapon in order to threaten the officers, (Suppression Hr'g Tr. at 57). These extra facts conceivably added to the officers' level of suspicion, but the district court never assessed whether the officers testified credibly about these facts or analyzed, assuming the officers were credible, whether Blackwell reasonably concluded from the available information that Johnson was on the verge of retrieving a weapon to threaten the officers. We believe these determinations are crucial in order to assess whether the officers had a reasonable, articulable suspicion for stopping Johnson when he began to retreat into his house, and because we are not positioned to assess credibility and decide factual questions, we think it best to remand this case to the district court to determine these matters in the first instance. The district court, after supplementing its findings of fact, should assess whether the officers reasonably suspected that Johnson was engaged in or was about to engage in criminal activity. We request that the district court complete its analysis and file a supplemental decision on Johnson's motion to suppress. We also ask the district court to do so as quickly as possible because the appeal will remain pending before this panel for decision.

REMANDED.