STATE OF CONNECTICUT *v.* JASON MANN
(SC 16996)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued February 17—officially released October 5, 2004

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Maura Coyne*, deputy assistant state's attorney, for the appellant (state).

*Glenn W. Falk*, special public defender, for the appellee (defendant).

*Opinion*

PALMER, J. After a trial to the court, the defendant, Jason Mann, was convicted of possession of a narcotic substance with intent to sell by a person who is not drug-dependant in violation of General Statutes § 21a-278 (b), possession of a narcotic substance with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), and possession of a controlled substance in violation of General Statutes § 21a-279 (c). The trial court rendered judgment sentencing the defendant to a total effective term of seventeen years imprisonment, suspended after twelve years, and five years probation. On appeal to the Appellate Court, the defendant challenged the trial court's denial of his motion to suppress certain evidence that he claimed had been seized by the police in violation of his rights under the fourth amendment to the United States constitution[1] during a warrantless patdown search of the defendant while he was inside an apartment. The Appellate Court

[1] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment right to be free from unreasonable searches and seizures is made applicable to the states by incorporation through the due process clause of the fourteenth amendment. See *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

agreed with the defendant that the search was constitutionally infirm and, therefore, reversed the trial court's judgment and remanded the case with direction to grant the defendant's motion to suppress and for further proceedings according to law.[2] *State* v. *Mann*, 76 Conn. App. 48, 67, 818 A.2d 122 (2003). We granted the state's petition for certification to appeal, limited to the question of whether the Appellate Court correctly concluded that the trial court improperly denied the defendant's motion to suppress. See *State* v. *Mann*, 263 Conn. 926, 823 A.2d 1218 (2003). We answer that question in the negative and, therefore, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts. "At approximately 4:25 a.m. on October 3, 2000, three uniformed New Haven police officers, Christopher Rubino, Julie Esposito and Victor Fuentes, responded to a call that a dispute was taking place on Stevens Street near Sylvan Avenue in New Haven. When the officers arrived in the area, they spoke to a woman who identified herself as Tina Jones. Jones admitted having been part of the dispute on Stevens Street[3] and volunteered information about drug activity in the area. She told the officers that an apartment at 130 Sylvan Avenue had just received a shipment of drugs, that the recipient of the drugs was a black male, that 'they dealt everything out of that apartment' and that she was unsure as to whether there were weapons in the apartment. Jones described the apartment as being on the first floor, last door on the left, when the building is entered from the rear.

---

[2] The defendant also claimed that his rights under article first, § 7, of the Connecticut constitution were violated. Because the defendant had failed to provide an independent analysis of his state constitutional claim, however, the Appellate Court did not address it. *State* v. *Mann*, 76 Conn. App. 48, 50 n.2, 818 A.2d 122 (2003).

[3] Jones also told the police that she resided in an apartment located at 73 Stevens Street.

"After receiving the information from Jones, the officers proceeded to the apartment at 130 Sylvan Avenue. They entered 130 Sylvan Avenue from the unlocked rear door. At approximately 5 a.m., Rubino knocked on the door of the apartment described by Jones. Although in uniform, the officers did not at anytime announce themselves as police. The defendant responded by opening the door one and one-half to two feet, which was wide enough for the defendant's entire body to be visible. Upon opening the door and seeing the police, the defendant attempted to close the door using his left hand and the left side of his body. Simultaneously, the defendant placed his right hand into his right pocket. When Rubino saw the defendant place his right hand in his pocket, he drew his gun, entered the apartment, placed the defendant against a wall and conducted what he described as 'a Terry[4] patdown' for weapons. No weapons were found, but Rubino did, in conducting the patdown, determine that the defendant's right pants pocket 'had a quantity of plastic baggies with little rock-like things in them,' which Rubino identified as possible narcotics. After completing the patdown and assuring himself that the defendant had no weapons, Rubino reached into the defendant's right pocket and withdrew its contents, which included fifty small bags containing crack cocaine and four small bags containing marijuana. Thereafter, the defendant was arrested and charged with various offenses relating to his possession of the crack cocaine and the marijuana."[5] *State* v. *Mann*, supra, 76 Conn. App. 50–51.

---

[4] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[5] For purposes of this appeal, we treat the apartment at 130 Sylvan Avenue, where the search took place, as the defendant's home. The defendant testified at the suppression hearing that he had been staying at the apartment, which was leased to a friend, and paying rent for three to four weeks. The trial court determined that the defendant had a legitimate expectation of privacy in the apartment, and that finding has not been challenged on appeal.

The defendant filed a motion to suppress the crack cocaine and marijuana seized during the patdown search of his person. After an evidentiary hearing, the trial court issued a ruling from the bench denying the defendant's motion. In so ruling, the trial court relied on the following factual findings. After speaking with Jones, the officers approached the apartment that she had identified. The officers could hear voices coming from inside the apartment. Rubino knocked on the apartment door two or three times but did not otherwise identify or announce himself or his fellow officers. The defendant then opened the door and immediately tried to shut it while simultaneously reaching into his pocket, giving the officers "the choice of retreating, and possibly being shot through [the] wooden door, or advancing upon the defendant to enable the police officers to conduct a patdown [search of the defendant] . . . to determine whether . . . [he] was armed." The trial court emphasized that, because the incident had lasted only a few seconds, and because Rubino "was only one and [one]-half feet away from the defendant," Rubino's decision to conduct a patdown search of the defendant for weapons necessarily was a "split-second" decision. The court further observed that, under the circumstances, including the defendant's "furtive acts," the officers' safety was in "extreme jeopardy," and that "retreating would [not] have ensured the safety of those officers."[6] Finally, the court determined that the officers had a reasonable and articulable suspicion that the defendant was armed and posed a danger to them, and that he "was about to commit a crime," namely, possessing a weapon that "could be fired . . . ."[7]

---

[6] The trial court further found that, in light of "the possibility of gunfire in a common hallway," the other occupants of the apartment, along with the police, also would have been endangered if the defendant had been armed.

[7] The court also credited evidence adduced by the state that: (1) 130 Sylvan Avenue is located in an area known for its substantial criminal activity; (2) that address had been the subject of prior criminal investigations; (3) approximately one hour before the investigating officers responded to the reported dispute on Stevens Street, Rubino saw a group of people

On the basis of the foregoing findings, the trial court concluded that the patdown search of the defendant did not violate his fourth amendment rights. Specifically, the trial court determined that, under all of the circumstances, the defendant's conduct had created an exigency justifying the officers' warrantless entry across the threshold of the apartment for the limited purpose of conducting a patdown search of the defendant for weapons.[8]

On appeal to the Appellate Court, the defendant claimed that the trial court improperly had denied his motion to suppress the crack cocaine and the marijuana seized by the officers as a result of the patdown search. The state raised three claims in support of its contrary contention. First, the state claimed that the search was justified under the exigent circumstances exception to the warrant requirement. See, e.g., *State* v. *Gant*, 231 Conn. 43, 64, 646 A.2d 835 (1994) (exigent circumstances exception to warrant requirement applies generally to those activities in which police are "unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and . . . without seeking prior judicial authoriza-

gathered behind 130 Sylvan Avenue, most of whom had scattered at the sight of Rubino's marked police cruiser, and that such activity is consistent with street level narcotics trafficking; and (4) the police had determined that the layout of the apartment complex at 130 Sylvan Avenue was as Jones had described it.

[8] The trial court also determined that, although the facts known to the police officers at the time of entry supported a reasonable and articulable suspicion that the defendant was armed and dangerous and "about to commit a [gun-related] crime," that suspicion did not rise to the level of probable cause. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause." (Internal quotation marks omitted.) *State* v. *Groomes*, 232 Conn. 455, 468, 656 A.2d 646 (1995). The state does not dispute that the officers lacked probable cause either to arrest the defendant or to search the apartment.

tion"), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). Second, the state contended that the search was permissible because the police had a reasonable and articulable suspicion that the defendant was armed and dangerous; see *Terry* v. *Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (police officer may detain suspect and engage in stop-and-frisk investigation if officer has reasonable and articulable suspicion that suspect is armed and dangerous); and the defendant, having exposed himself to public view by voluntarily opening the apartment door for the police, had a sufficiently reduced expectation of privacy such that the *Terry* patdown search was reasonable even though it was conducted inside the doorway of the apartment. See *Katz* v. *United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[w]hat a person knowingly exposes to the public, even in his own home . . . is not a subject of Fourth Amendment protection"). Third, the state contended that the emergency exception justified the officers' entry into the apartment. See, e.g., *State* v. *Blades*, 225 Conn. 609, 618, 626 A.2d 273 (1993) ("[t]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid" [internal quotation marks omitted]). The Appellate Court rejected each of these contentions, concluding that, in the absence of a warrant or probable cause and exigent circumstances, the fourth amendment barred the officers from crossing the threshold of the apartment to conduct a patdown search of the defendant. See *State* v. *Mann*, supra, 76 Conn. App. 67. This certified appeal followed.

On appeal to this court, the state's primary claim is that the patdown search of the defendant was constitutionally permissible because the police, while conduct-

ing a lawful investigation, were confronted with an emergency situation stemming from the fact that the defendant, who, upon voluntarily opening the apartment door for the police, engaged in conduct that reasonably caused the police to suspect that he was armed and posed a danger to them. The defendant contends that the Appellate Court properly determined that the patdown search violated the fourth amendment because it occurred inside a home, without a warrant and without probable cause.[9] The defendant also maintains that the police lacked even a reasonable and articulable suspicion that the defendant posed a danger to them. We agree with the state that the police were justified in conducting the patdown search of the defendant. This conclusion is predicated on two subordinate determinations. First, the fourth amendment does not categorically bar the police from conducting a warrantless patdown search of a person who, upon voluntarily opening his door in response to a lawful police inquiry, engages in conduct while standing inside the doorway that leads the police reasonably to suspect that he is armed and dangerous. Second, the trial court properly determined that the police had a reasonable and articulable suspicion that the defendant was armed and posed a danger to them.

I

We begin our review of the fundamental constitutional issue presented by this appeal by noting that,

[9] The defendant also claims that his rights under article first, § 7, of the Connecticut constitution were violated. As we have indicated; see footnote 2 of this opinion; the defendant raised a similar claim in the Appellate Court but that court declined to review the claim because he had failed to provide an independent analysis under the comparable state constitutional provision. *State* v. *Mann,* supra, 76 Conn. App. 50 n.2. The defendant has not provided us with any reason why he should be permitted to analyze that claim for the first time in connection with the state's certified appeal to this court. Therefore, we, too, decline to review the defendant's state constitutional claim.

when police officers knock on the door of a dwelling and an occupant voluntarily opens the door, the resulting encounter, in the absence of coercive police conduct, generally is deemed to be consensual. E.g., *Estate of Smith* v. *Marasco*, 318 F.3d 497, 519 (3d Cir. 2003) ("[police] [o]fficers are allowed to knock on a . . . door [to a residence] or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may"); *United States* v. *Jerez*, 108 F.3d 684, 691–92 (7th Cir. 1997) ("knock and talk" encounter generally is consensual unless there is evidence of coercive circumstances such as unreasonable persistence by police officers); *United States* v. *Kim*, 27 F.3d 947, 951 (3d Cir. 1994) (in absence of coercive circumstances, fact that resident responds to knock on door by police does not render encounter nonconsensual), cert. denied, 513 U.S. 1110, 115 S. Ct. 900, 130 L. Ed. 2d 784 (1995). In the present case, Rubino, who was in uniform, knocked on the door several times. Although Rubino did not identify himself as a police officer, he did not demand that the defendant open the door and did not engage in any other coercive conduct. The defendant was free to ignore the knock and his decision to do otherwise was voluntary.[10] See *State* v.

---

[10] We acknowledge that it was approximately 5 a.m. when Rubino knocked on the door to the apartment. In general, the fact that such an encounter between the police and the occupant of a residence occurs at night or in the early morning hours is relevant to a determination of whether the encounter was consensual. See, e.g., *United States* v. *Jerez*, supra, 108 F.3d 690 ("[b]ecause our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place, our Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution"). In the present case, however, the evidence indicated that the investigating officers heard voices coming from inside the apartment before they knocked on the apartment door and, furthermore, that the defendant, as well as others in the apartment, were awake when Rubino knocked on the door. Under such circumstances, the fact that the encounter occurred early in the morning has little, if any, bearing on the issue of whether the encounter was consensual.

*Santiago*, 224 Conn. 494, 500, 619 A.2d 1132 (1993) (defendant who opened door in response to officer's knock, without any coercion by police, did so voluntarily). Moreover, as a general matter, no objective level of suspicion is required for investigating officers merely to knock on the door of a person's residence. See, e.g., *United States* v. *Adeyeye*, 359 F.3d 457, 462 (7th Cir. 2004); *United States* v. *Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000), cert. denied, 531 U.S. 1174, 121 S. Ct. 1146, 148 L. Ed. 2d 1009 (2001). Nevertheless, Rubino and his fellow officers had a reasonable and articulable suspicion, based on the specific information that Jones had provided to them and the more generalized information that they had about the apartment complex, that criminal activity, namely, the possession of narcotics for trafficking, was ongoing in the apartment. Thus, the only issue of constitutional magnitude presented by this appeal is whether the officers lawfully crossed the threshold of the open door for the limited purpose of conducting a patdown search for weapons predicated only on a reasonable and articulable suspicion that the defendant was armed and dangerous.

"It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures, *Skinner* v. *Railway Labor Executives' Assn.*, 489 U.S. 602 [109 S. Ct. 1402, 103 L. Ed. 2d 639] (1989). [United States Supreme Court] cases show that in determining reasonableness . . . the intrusion on the individual's Fourth Amendment interests [must be balanced] against its promotion of legitimate governmental interests. *United States* v. *Villamonte-Marquez*, 462 U.S. 579, 588 [103 S. Ct. 2573, 77 L. Ed. 2d 22] (1983); *Delaware* v. *Prouse*, 440 U.S. 648, 654 [99 S. Ct. 1391, 59 L. Ed. 2d 660] (1979). Under this test, a search of the house or office is generally not reasonable without a warrant issued on probable cause. There are other contexts, however, where the public interest is such that neither a warrant

nor probable cause is required. *Skinner* [v. *Railway Labor Executives' Assn.*, supra, 619–20]; *Griffin* v. *Wisconsin*, 483 U.S. 868, 873 [107 S. Ct. 3164, 97 L. Ed. 2d 709] (1987); *New Jersey* v. *T. L. O.*, 469 U.S. 325, [340–41, 105 S. Ct. 733, 83 L. Ed. 2d 720] (1985); *Terry* v. *Ohio*, [supra, 392 U.S.] 20." *Maryland* v. *Buie*, 494 U.S. 325, 331, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

In *Terry* v. *Ohio*, supra, 392 U.S. 1, the United States Supreme Court held that neither a warrant nor probable cause is required to conduct a patdown search of a suspect on a public street because such a patdown involved "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." Id., 20. To determine whether the patdown search was unreasonable, and, thus, a violation of the fourth amendment, the court in *Terry* balanced the need to conduct the search against the invasion of privacy occasioned by the search. Id., 22–25. Although the court acknowledged that a patdown search for weapons constitutes a serious intrusion into the suspect's privacy rights; see id., 25; the court nevertheless concluded that such a search is reasonable under the fourth amendment when weighed against the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." Id., 24. Accordingly, the court authorized a limited patdown search for weapons under circumstances in which a reasonably prudent officer is warranted in believing, on the basis of specific and articulable facts, that the person with whom he is dealing is armed and dangerous. Id., 27, 30.

Although the United States Supreme Court has yet to apply the *Terry* doctrine to "knock and talk" investigations, the court has extended the reasonable suspi-

cion standard announced in *Terry* to other contexts involving possible jeopardy to the immediate safety of law enforcement officers. For example, in *Michigan* v. *Long*, 463 U.S. 1032, 1035, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), the court, relying on *Terry*, held that a warrantless, protective search of the passenger compartment of a vehicle, which had been lawfully stopped by the police, did not violate the occupant's fourth amendment rights despite the absence of probable cause to conduct the search. The court stated that its "past cases indicate . . . that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . ." Id., 1049. Furthermore, the court noted that "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." Id. Thus, the court concluded that, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and [that] the suspect may gain immediate control of weapons." (Internal quotation marks omitted.) Id.

The United States Supreme Court also extended the *Terry* doctrine to certain protective searches of a suspect's home in *Maryland* v. *Buie*, supra, 494 U.S. 327. In *Buie*, the police entered the home of the suspect with a warrant for his arrest. Id., 328. The arrest warrant, together with probable cause to believe that the suspect was at home, provided a constitutionally sufficient basis for the officers to enter the house and search for the suspect until he was found. Id., 332–33. The officers

continued their "protective sweep"[11] of the house, however, even after they had located and arrested the suspect. Id., 333. Thus, the continued search, which resulted in the seizure of incriminating evidence; id., 328; was not authorized by the arrest warrant. See id., 330, 333. The court relied on both *Terry* and *Long* in holding that the officers' protective sweep of the dwelling, although warrantless and not supported by probable cause, was justified by the threat posed by any unseen third parties who might have been in the house. Id. The court further concluded that neither probable cause nor reasonable suspicion is necessary for the police to conduct a protective sweep of the areas immediately adjacent to the place of the arrest,[12] and, further, that additional areas may be searched if the facts support an objectively reasonable belief that any such area harbors an individual who poses a danger to those on the scene. Id., 334.

*Long* and *Buie* both demonstrate that when the immediate safety of law enforcement officers is in jeopardy, the reasonableness of a protective search is determined by balancing the need to conduct the search against the nature of the intrusion occasioned by the search. See *Terry* v. *Ohio*, supra, 392 U.S. 20–21. The defendant contends, however, that the relaxed standards of *Terry* cannot be applied to searches occurring inside a home because the home is accorded heightened protection under the fourth amendment. See, e.g., *Payton* v. *New*

---

[11] A "protective sweep" is a "cursory inspection of those spaces where a person may be found." *Maryland* v. *Buie*, supra, 494 U.S. 335.

[12] The court reasoned that such a protective sweep was justified under the search incident to arrest doctrine pursuant to which police officers may search the area within the immediate control of the arrestee contemporaneously with the arrest in order to prevent the arrestee from gaining access to weapons and to prevent the concealment or destruction of evidence. *Maryland* v. *Buie*, supra, 494 U.S. 334; see *Chimel* v. *California*, 395 U.S. 752, 762–63, 89 S. Ct. 2034, 63 L. Ed. 2d 23 (1969) (discussing search incident to arrest doctrine).

*York,* 445 U.S. 573, 586, 589–90, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). According to the defendant, the police lawfully cannot cross the threshold of a home without either a warrant or probable cause and exigent circumstances. We disagree.

It is indisputable that the home is afforded heightened protection under the fourth amendment. "We have long acknowledged that entry by the government into a person's home is the chief evil against which the wording of the Fourth Amendment is directed." (Internal quotation marks omitted.) *State* v. *Eady,* 249 Conn. 431, 454–55, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999). "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.' [U.S. Const., amend. IV.] That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Payton* v. *New York,* supra, 445 U.S. 589–90. Thus, the court concluded in *Payton* that, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id., 590.

*Buie* makes clear, however, that the firm line drawn at the entrance to the home does not preclude every warrantless search of a residence undertaken on less than probable cause.[13] *Maryland* v. *Buie,* supra, 494

---

[13] Although, in *Buie,* the initial entry into the suspect's home and the search for and arrest of the suspect was authorized under an arrest warrant,

U.S. 327; see also *United States* v. *Knights*, 534 U.S. 112, 121, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001) (warrantless search of probationer's home was constitutionally permissible even though it was supported only by reasonable suspicion); *State* v. *Gant,* supra, 231 Conn. 68 (search of apartment did not violate fourth amendment where officers had reasonable and articulable suspicion that defendant was dangerous and when purpose of search was limited to neutralizing area from which harm might have arisen). In fact, the court in *Buie* rejected the contention that a protective sweep of a home that is based on less than probable cause is impermissible under "the sanctity of the home" rationale. See *Maryland* v. *Buie,* supra, 333–34 and n.1, 336. Moreover, the rationale for excepting the protective searches in *Terry, Long* and *Buie* from the warrant and probable cause requirements of the fourth amendment is dependent not so much on the location of the search as on the need for swift action by police officers who, while conducting lawful investigations, find themselves in a position of imminent peril. See id., 333; *Michigan* v. *Long,* supra, 463 U.S. 1052.

Of course, the fact that a patdown search occurs inside a home is not irrelevant to our analysis. The balancing test announced in *Terry* requires that we consider both the government's interest in conducting the search and the nature and quality of the intrusion on the rights of the individual. *Terry* v. *Ohio,* supra, 392 U.S. 20–21. In *Terry,* the court recognized that, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security . . . ." Id., 24–25. Moreover, a person who is frisked for weapons inside his home suffers an additional intrusion into the most jealously guarded of private spaces. See, e.g., *Payton* v. *New*

---

the subsequent protective sweep of the suspect's home was not. See *Maryland* v. *Buie,* supra, 494 U.S. 330.

*York,* supra, 445 U.S. 589–90. Although this intrusion undoubtedly is considerable, the entry into a home for the sole purpose of patting down a suspect located just inside the doorway is a far less significant intrusion than a full-blown search of the premises for evidence of a crime. Furthermore, the occupant of a residence who voluntarily opens the door of that residence has no reasonable expectation of privacy in what can be seen through the open door. See *United States* v. *Santana,* 427 U.S. 38, 42, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976);[14] see also *United States* v. *Gori,* 230 F.3d 44, 53 (2d Cir. 2000) ("[o]nce the apartment was opened to public view by the defendants in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall"), cert. denied sub nom. *Pichardo* v. *United States,* 534 U.S. 824, 122 S. Ct. 62, 151 L. Ed. 2d 29 (2001); *Fontenot* v. *Cormier,* 56 F.3d 669, 674 (5th Cir. 1995) (expectation of privacy in one's home that was recognized in *Payton* v. *New York,* supra, 589–90, does not exist when "suspect stands at the open door of his residence or is otherwise

---

[14] In *Santana,* police officers learned that the defendant possessed marked money that had been used in an arranged, undercover drug transaction. *United States* v. *Santana,* supra, 427 U.S. 39–40. Upon arriving at the defendant's house, the officers observed the defendant standing in the doorway. Id., 40. As the officers displayed their badges and identified themselves, the defendant retreated into the vestibule of the house. Id. The officers, who did not have a warrant, followed her through the open door and caught her in the vestibule. Id. A struggle ensued during which the defendant dropped some packets containing what was later determined to be heroin. Id., 40–41.

The court concluded that the defendant did not have any expectation of privacy in the doorway of her house under the circumstances as she not only was visible to the public "but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." Id., 42. The court stated that, "[w]hile it may be true that under the common law of property the threshold of one's dwelling is private . . . it is nonetheless clear that under the cases interpreting the Fourth Amendment [the defendant] was in a public place. She was not in an area where she had any expectation of privacy. What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." (Internal quotation marks omitted.) Id.

accessible to the public"); *United States* v. *Herring*, 582 F.2d 535, 543 (10th Cir. 1978) (arrestee had no expectation of privacy in entrance to his motel room).

Furthermore, the intrusion into an individual's privacy must be balanced against the government's overwhelming interest in conducting the limited search for weapons. As in *Terry*, "in addition [to the governmental interest in investigating crime], there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry* v. *Ohio*, supra, 392 U.S. 23. "In terms of danger to the police and others, there is no appreciable difference between (i) a typical *Terry* encounter between officers and suspects that might occur in the hallway of an apartment building and (ii) the situation . . . in which police standing in the hallway come face to face with [a suspect] through a door opened voluntarily by the [suspect] . . . ."[15] *United States* v. *Gori*, supra, 230 F.3d 56.

In view of the state's weighty interest in promoting the safety of its police officers and the diminished expectation of privacy that the occupant of a dwelling has in what the police can observe through a door that that occupant voluntarily has opened, we conclude that it is constitutionally permissible for the police to conduct a limited patdown search of the occupant, even though that occupant is located inside the doorway, if the search is supported by a reasonable and articulable suspicion that the occupant is armed and dangerous. "[W]hile we respect the constitutional rights against unreasonable search and seizure of the citizenry, [c]er-

---

[15] As the Second Circuit Court of Appeals has recognized; *United States* v. *Gori*, supra, 230 F.3d 53; the court's holding in *Santana* is no less applicable to situations in which the information available to the police officers gives rise to a reasonable and articulable suspicion than it is to situations in which the information gives rise to probable cause.

tainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." (Internal quotation marks omitted.) *State v. Gant*, supra, 231 Conn. 68. Indeed, "[t]he notion is abhorrent that police who are investigating a crime and suddenly find themselves at risk are precluded from acting reasonably in response to that risk merely because they have not yet established probable cause to make an arrest for a crime."[16] *United States v. Beaudoin*, 362 F.3d 60, 68–69 (1st Cir. 2004); see also *United States v. Reid*, 997 F.2d 1576, 1578 (D.C. Cir. 1993) ("the Supreme Court has made it clear that the Fourth Amendment protection from unlawful search and seizure is not an impenetrable barrier to the police performing their necessary tasks and protecting themselves from concealed weapons in such performance"), cert. denied, 510 U.S. 1132, 114 S. Ct. 1105, 127 L. Ed. 2d 417 (1994); *United States v. Kinney*, 638 F.2d 941, 944 n.2 (6th Cir.) ("[o]bviously, the Constitution does not limit the government officers' rights to protect themselves from assault when their fear is reasonably based on objective facts"), cert. denied, 452 U.S. 918, 101 S. Ct. 3056, 69 L. Ed. 2d 423 (1981). Thus, whether an otherwise lawful encounter between the police and the subject of an investigation occurs on the street or, as in the present case, in the open doorway of a residence, the following admonition by the United States Supreme Court in *Terry* is equally applicable: "[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of

---

[16] In support of his contention that the patdown search violated his rights under the fourth amendment, the defendant relies on several cases holding that *Terry* did not justify the search or seizure that had occurred inside the home. See, e.g., *LaLonde v. Riverside*, 204 F.3d 947, 954–55 (9th Cir. 2000); *People v. Robert*, 156 App. Div. 2d 730, 730, 549 N.Y.S.2d 176 (1989), appeal denied, 76 N.Y.2d 741, 557 N.E.2d 1199, 558 N.Y.S.2d 903 (1990); *Mickelson v. State*, 906 P.2d 1020, 1022–24 (Wyo. 1995). These cases are inapposite, however, because none involved circumstances that gave rise to a reasonable and articulable suspicion that the suspect was armed and dangerous.

violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."[17] *Terry* v. *Ohio*, supra, 392 U.S. 24.

Our conclusion is not inconsistent with the long-standing rule that "the police must, whenever practica-

---

[17] It is true that, in *Terry*, the United States Supreme Court considered the constitutionality of a patdown search, undertaken on the street, of a person who the police reasonably suspected was committing or was about to commit a crime. See *Terry* v. *Ohio*, supra, 392 U.S. 22–23. Although the police in the present case had a reasonable basis to suspect that the apartment at 130 Sylvan Street was the site of illegal activity, namely, illicit drug trafficking, they had no reason to suspect, in contrast to the officer in *Terry*, that any particular individual was involved in the suspected illegal activity. Because, however, the officers in the present case were engaged in a lawful investigation of the apartment at 130 Sylvan Street, and because the defendant voluntarily opened the door to that apartment in response to Rubino's knock on the door, we see no material distinction between the initial lawful encounter in *Terry* and the initial lawful encounter in the present case. Indeed, as the court in *Terry* emphasized, "[t]he crux" of that case was "not the propriety of [the investigating officer's] taking steps to investigate [the suspect's] suspicious behavior, but rather, whether there was justification for [the officer's] invasion of [the suspect's] personal security by searching him for weapons in the course of that investigation. [The court is] now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." Id., 23. Thus, as a general matter, it would be unreasonable to conclude that the fourth amendment bars an officer from patting down a person for weapons, if the officer has a reasonable and articulable suspicion that that person is armed and potentially dangerous, whenever, in the discharge of his official duties, the officer lawfully encounters such a person. In other words, as long as the officer reasonably suspects that a person whom he has lawfully encountered is armed and dangerous, the officer's interest in conducting a limited patdown search for weapons will outweigh that individual's privacy interest in being free from that intrusion.

ble, obtain advance judicial approval of searches and seizures through the warrant procedure." Id., 20. Nor does our holding signal a retreat from the fourth amendment's general proscription against the warrantless entry into a home to search for evidence or to secure an arrest unless the entry is supported by either a warrant or by both probable cause and the existence of exigent circumstances. Moreover, we authorize no more than what is reasonably necessary to protect investigating officers from possible harm. "Because a patdown search is intended to secure the safety of the investigating officer, it is strictly limited to a search for weapons. The officer cannot conduct a general exploratory search for whatever evidence of criminal activity [the officer] might find. . . . Furthermore, a patdown search for weapons that is justified at its inception becomes constitutionally infirm if the search thereafter becomes more intrusive than necessary to protect the safety of the investigating officer." (Citations omitted; internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 224, 673 A.2d 1098 (1996). Finally, if the facts demonstrate that officers deliberately sought to provoke a dangerous encounter in order to circumvent the warrant requirement, the resulting search will be deemed per se unreasonable. See *United States* v. *Cantu*, 230 F.3d 148, 158 (5th Cir. 2000) (government cannot rely on exigency created by officers to justify warrantless search); *United States* v. *Curzi*, 867 F.2d 36, 43 n.6 (1st Cir. 1989) (police may not manipulate events to create exigency justifying warrantless entry). In sum, we conclude only that when police officers knock on a door as part of a lawful investigation, and the door is voluntarily opened by an occupant, the officers may enter the dwelling to patdown the occupant for weapons if a reasonably prudent officer would be warranted in believing, on the basis of specific and

articulable facts, that the person with whom the officer is dealing is armed and poses an immediate danger.[18]

[18] The Appellate Court rejected the state's contention that the patdown search of the defendant was justified under the principles articulated in *Terry* and *Santana* primarily because of its conclusion that *Payton,* and not *Santana,* is the constitutional precedent applicable to the issue raised by the search at issue in the present case. *State* v. *Mann,* supra, 76 Conn. App. 55, 59–60, 62, 67. In particular, the Appellate Court concluded that *Payton* categorically bars the warrantless entry into a home in the absence of exigent circumstances; id., 62; and that *Santana* is limited to situations in which the occupant who appears in the doorway also acquiesces in his detention by the police. Id., 59–60. For the reasons set forth in part I of this opinion, we reject the Appellate Court's reading of *Payton* as too broad.

With respect to the Appellate Court's reading of *Santana,* we reject that interpretation as too narrow. In concluding that *Santana* has no applicability to the present case, the Appellate Court construed *Santana* as "focus[ing] on the defendant's reasonable expectation of privacy in light of his conduct after opening the door in response to a knock by the police. [The Appellate Court] therefore focus[ed] [its] inquiry on the defendant's reasonable expectation of privacy in light of his conduct after opening the door in response to the knock by the police." Id., 60. In reaching that conclusion, the Appellate Court noted that, "[f]ollowing *Santana* and *Payton* . . . courts have struggled with cases in which the police have made warrantless, probable cause arrests at the doorway of a defendant's home following the opening of the door by the defendant in response to a knock on the door by the police. The focus of the inquiry in these cases has been whether the principles of *Santana* or *Payton* apply—whether the arrest was in a public place in which the defendant had no reasonable expectation of privacy, or whether the arrest was made in the home, a place in which the defendant ha[s] the highest expectation of privacy." (Internal quotation marks omitted.) Id., 59. The Appellate Court thereupon adopted the view of several courts that, "if a defendant opens the door in response to a police knock and acquiesces in the ensuing arrest, the arrest is valid under *Santana,* but that a defendant, by merely opening the door in response to a knock by the police, does not, without more, surrender a reasonable expectation of privacy in the home under *Payton.*" (Internal quotation marks omitted.) Id., 59–60. Upon application of that principle, the Appellate Court concluded that the defendant's conduct after Rubino's knock on the door demonstrated that he had not abandoned his privacy interest in the apartment merely by opening the door for police. Id., 60. On the basis of this determination, the Appellate Court further concluded that *Payton,* and not *Santana,* applies to the present case. Id., 62, 67.

We note that this court has reserved the question of whether *Santana* applies when the police enter a suspect's home to arrest him after the suspect has opened his door in response to a knock by the police but thereafter manifests an intent not to relinquish his privacy interest in his home. See *State* v. *Santiago,* supra, 224 Conn. 502. We need not resolve this issue, however, because the present case, unlike *Payton* and *Santiago,*

## II

We turn next to the issue of whether the patdown search of the defendant was supported by a reasonable and articulable suspicion that the defendant was armed and dangerous.[19] We conclude that it was.[20]

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is

does not require us to determine the constitutionality of a warrantless *arrest* of a suspect inside his home but, rather, to determine the constitutionality of a limited patdown search for weapons based on a reasonable and articulable suspicion that the suspect was armed and dangerous. As we have explained, the defendant's expectation of privacy is relevant under these circumstances only to the extent that it outweighs, or does not outweigh, the state's interest in conducting the patdown search. In determining the relative weight of the defendant's privacy interest, *Santana* dictates that the fact that the defendant placed himself in plain view of the police, only one foot or two feet away from them, demonstrates, at a minimum, that the defendant had a reduced expectation of privacy. Having voluntarily placed himself in such close and visual proximity to the police, the defendant cannot reasonably claim that he retained the same expectation of privacy that he would have had if he had not opened the door at all. Thus, we need not decide whether, under *Santana*, the police lawfully could have entered the defendant's home to *arrest* him; we must determine only whether, in light of whatever expectation of privacy the defendant reasonably may have retained by virtue of his conduct after opening the door for the police, the defendant had the right to be free from a limited patdown search, inside the home, based on a reasonable suspicion that the defendant was armed and dangerous. In making that determination, we simply cannot ignore the fact that the defendant, although under no obligation to do so, opened the door to his apartment, thereby placing him face-to-face with the investigating officers under circumstances that would lead them reasonably to suspect that he posed a danger to them.

[19] The Appellate Court did not address this issue in light of its conclusion that the patdown search was not justified under the fourth amendment because it was not predicated on probable cause. See generally *State* v. *Mann*, supra, 76 Conn. App. 55, 67.

[20] On appeal to the Appellate Court, the defendant claimed that, even if the officers were justified in patting him down for weapons, they were not justified in removing the crack cocaine and marijuana from his pocket. *State* v. *Mann*, supra, 76 Conn. App. 52 n.4. But cf. *Minnesota* v. *Dickerson*, 508 U.S. 366, 375–76, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993) (officer may seize contraband that he detects through his sense of touch while conducting lawful *Terry* patdown search). The defendant has not raised that claim on appeal to this court, however. Moreover, the defendant does not otherwise challenge the scope of the patdown search.

well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004). Neither the state nor the defendant challenges the factual findings of the trial court. Our review, therefore, is limited to a determination of whether the police had a reasonable and articulable suspicion that the defendant was armed and dangerous.

"Any inquiry into the permissible justification for, and boundaries of, a particular investigatory detention and patdown search is necessarily factbound." *State* v. *Trine*, supra, 236 Conn. 224. "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." (Internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75, 779 A.2d 88 (2001). In ascertaining whether reasonable suspicion existed for the patdown search, "the totality of the circumstances—the whole picture—must be taken into account." *United States* v. *Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

The trial court found that the officers were aware of the following relevant facts before knocking on the defendant's door: (1) 130 Sylvan Avenue is located in an area known for substantial criminal activity; (2) that address had been the subject of prior criminal investigations; (3) individuals were engaged in suspicious activity directly behind the apartment building approximately one and one-half hours before the officers knocked on the door to the apartment; (4) Jones

reported that a drug delivery had been received by an unidentified black male at that apartment several hours earlier; (5) Jones further reported that drugs were being packaged at the apartment; and (6) voices could be heard coming from inside the apartment. On the basis of these facts, the trial court concluded, and we agree, that the officers had a generalized but reasonable suspicion that criminal activity was ongoing in the apartment when they approached it.

Upon reaching the apartment, Rubino knocked on the door two or three times. The defendant responded by opening the door one and one-half feet to two feet wide. Upon observing the uniformed officers, the defendant attempted to close the door with his left hand while thrusting his right hand into his pocket. The trial court concluded that the defendant's conduct, coupled with the other information that the police had about the apartment, gave rise to a reasonable suspicion that the defendant was armed and posed a danger to the investigating officers. We also agree with this conclusion of the trial court.

"[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Furthermore, when an individual suddenly changes his course of conduct upon seeing the police, such conduct tends to support a reasonable suspicion that the individual may be involved in criminal activity. See, e.g., id., 124–25 (unprovoked, headlong flight from police); *United States* v. *Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001) (furtive gestures in response to police presence); *United States* v. *Mancillas*, 183 F.3d 682, 697 (7th Cir. 1999) (suspects walked away in different directions), cert. denied, 529 U.S. 1005, 120 S. Ct. 1271, 146 L. Ed. 2d 221 (2000); *United States* v. *Sholola*, 124 F.3d 803, 814 (7th Cir. 1997) (suspect "walk[ed] briskly in the opposite direction" as officer started to walk toward

him); *State* v. *Groomes*, 232 Conn. 455, 469–70, 656 A.2d 646 (1995) (suspect got off bike and ran as police vehicle approached). Although the defendant had a right to close the door upon seeing the police, the speed with which he did so reasonably caused the officers to believe that he may have been concealing something.

Furthermore, "Connecticut courts repeatedly have noted that '[t]here is a well established correlation between drug dealing and firearms.' *State* v. *Cooper*, 227 Conn. 417, 426 n.5, 630 A.2d 1043 (1993); see also, e.g., *State* v. *Carter*, 228 Conn. 412, 424 n.15, 636 A.2d 821 (1994); *State* v. *Delossantos*, 211 Conn. 258, 281, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). Federal courts also have recognized this fact of life. E.g., *Michigan* v. *Summers*, [452 U.S. 692, 702 n.17, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981)] (recognizing that execution of search warrant for narcotics 'may give rise to sudden violence'); *United States* v. *$109,179 in United States Currency*, 228 F.3d 1080, 1084 (9th Cir. 2000) (officer had reasonable suspicion to believe that defendant involved in narcotics operation might be armed); *United States* v. *Rivera*, 844 F.2d 916, 926 (2d Cir. 1988) ('weapons are . . . "tools of the [narcotics] trade" '); *United States* v. *Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (search of woman's handbag for weapons considered reasonable, self-protective 'minimal intrusion' when owner of handbag entered apartment at which search warrant was being executed and with individuals known to be dealing in narcotics)." *State* v. *Clark*, 255 Conn. 268, 284, 764 A.2d 1251 (2001). Thus, the facts supporting the officers' reasonable suspicion that the defendant may have been involved in narcotics trafficking also gave rise to a reasonable suspicion that the defendant was armed and dangerous.

Moreover, a suspect's attempt to reach into his pocket or some other place where a weapon may be

concealed is a fact that supports a reasonable suspicion that the suspect is armed and dangerous. See, e.g., *United States* v. *Robinson*, 119 F.3d 663, 667 (8th Cir. 1997) (suspect took his hands off steering wheel and moved them toward his waist); *United States* v. *Lane*, 909 F.2d 895, 900 (6th Cir. 1990) (defendant attempted to reach into his coat pocket), cert. denied, 498 U.S. 1093, 111 S. Ct. 977, 112 L. Ed. 2d 1062 (1991); *United States* v. *Landry*, 903 F.2d 334, 337 (5th Cir. 1990) (suspect observed reaching for bag). In the present case, Rubino observed the defendant suddenly thrust his hand into his pocket. That observation, coupled with the reasonable, albeit generalized, suspicion that drug activity was occurring in the apartment and the defendant's abrupt move to shut the door immediately upon seeing the officers, gave rise to a reasonable suspicion that the defendant was armed and dangerous.

The defendant maintains that, because the information Jones provided to the officers was uncorroborated, the officers reasonably could not have credited it. We reject this contention. Jones was not an anonymous informant; rather, she conveyed the information to the police in person. In contrast to a person who provides information to the police anonymously, the police were able to assess Jones' demeanor and credibility, and she could be held accountable if her information ultimately proved to be false.[21] See, e.g., *United States* v. *Valentine*, 232 F.3d 350, 354 (3d Cir. 2000) (information given by person face-to-face is more reliable than anonymous tip because police can evaluate credibility of informant), cert. denied, 532 U.S. 1014, 121 S. Ct. 1748, 149 L. Ed. 2d 670 (2001); *United States* v. *Salazar*, 945 F.2d 47, 50–51 (2d Cir. 1991) (face-to-face informant

[21] An anonymous tip generally does not satisfy the requirement of reasonable suspicion unless the tip is suitably corroborated or otherwise exhibits sufficient indicia of reliability. See, e.g., *State* v. *Hammond*, 257 Conn. 610, 617, 778 A.2d 108 (2001).

generally considered more reliable than anonymous telephone caller because face-to-face informant may be held accountable if information proves to be false), cert. denied, 504 U.S. 923, 112 S. Ct. 1975, 118 L. Ed. 2d 574 (1992). Moreover, "standards of reliability should not prevent appropriate police action when a victim of a crime immediately has contacted the police. . . . That same analysis applies [when an informant reports a crime to the police in person]." (Citation omitted.) *United States* v. *Gorin*, 564 F.2d 159, 161 (4th Cir. 1977), cert. denied, 434 U.S. 1080, 98 S. Ct. 1276, 55 L. Ed. 2d 788 (1978). Finally, Jones' credibility was bolstered both by virtue of her proximity to 130 Sylvan Avenue when, while on a public street, she provided information to the officers regarding criminal activity at that address, and by virtue of the proximity of her own residence to 130 Sylvan Avenue.[22] See, e.g., *United States* v. *Christmas*, 222 F.3d 141, 144 (4th Cir. 2000) (tip from informant sufficiently reliable to support reasonable suspicion when informant lived close to location of illegal activity and gave information to police in public area near that location), cert. denied, 531 U.S. 1098, 121 S. Ct. 830, 148 L. Ed. 2d 712 (2001). Furthermore, the information that Jones provided, along with the other information known by the police, must be considered along with the defendant's furtive actions—most importantly, perhaps, the thrusting of his hand into his

---

[22] We previously noted that Jones had told the officers that she resided at an apartment located at 73 Stevens Street. See footnote 3 of this opinion. Although the court declined to make a finding, on the basis of the evidence, that such an address actually existed, there is nothing in the record to suggest that the officers doubted, at the time of the search, either the existence of the address or Jones' veracity regarding the fact that she resided there. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida* v. *J. L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000). Thus, the inquiry as to whether an informant's statement is sufficiently reliable to support a finding of reasonable suspicion must focus on the information that the officers possessed about the informant when they received the information.

pocket—immediately upon the defendant's opening the door and observing the police.

The defendant further contends that the patdown search cannot be justified under the fourth amendment because he was attempting to shut the door to the apartment when the officers entered. According to the defendant, nothing "in the facts of this case or in common experience suggest[s] that a resident attempting to close a door . . . is likely to shoot *through* a door." (Emphasis in original.) We reject this argument. If the defendant had been armed, he easily could have shot through the wooden door or, alternatively, reopened the door and fired upon the officers as they retreated. Furthermore, as the trial court noted, Rubino had only a "split second" to react to the defendant while standing no more than between one and two feet from him. In such circumstances, Rubino was not required to calculate the probability that the defendant would proceed in a certain way before taking reasonable steps to protect himself and his fellow officers. See, e.g., *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (in assessing reasonableness under *Terry*, courts should "consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing"). Accordingly, we conclude that the patdown search of the defendant was properly supported by a reasonable suspicion that the defendant was armed and dangerous.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.